IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

DENNIS HUGHES,                    :
                                 :
          Appellant,             :
                                 :
     v.                          :     No. 13-4726
                                 :
KEVIN MISKELL, et al.,           :
                                 :
          Appellee               :

APPELLANT'S CONCISE ARGUMENT
IN SUPPORT OF HIS APPEAL

## I.   INTRODUCTION

On July 13, 2010, Plaintiff filed, through counsel, a civil rights action against certain prison officials and medical providers at the State Correctional Institution at Dallas. Appellant is a **100% disabled veteran** serving a life sentence. Based on various medical and psychiatric diagnoses, Appellant sought appropriate psychiatric counseling, medications, and the granting of a **Z-code (single cell)** housing status to minimize Appellant's anxiety level and to protect him and other inmates from potential outbursts or threatening actions due to psychiatric and medical diagnoses.

Appellant also sought relief pursuant to provisions of the **Americans With Disabilities Act (ADA)** which prohibits prisons from discriminating against prisoners with disabilities, 42 U.S.C. §12132.[1]

Following the filing of several amended complaints, the Defendants moved for summary judgment based on Appellant's failure to properly exhuast all of his administrative remedies pursuant to the Prison Litigation Reform Act ("PLRA").

At issue in this appeal is whether the District Court committed legal error by granting Defendant's motion for summary judgment.

## II.  ARGUMENT

A.    THE DISTRICT COURT ERRED IN CONCLUDING THAT PLAINTIFF "NEVER MADE A FORMAL REQUEST FOR ACCOMMODATIONS...UNDER THE DEPARTMENT['S] DC-ADM 006 [ADA] POLICY."

The District Court opinion noted that "[a]lthough the plaintiff references DC-ADM 006 in several of his grievances, indicating his awareness of the procedure to be followed in obtaining ADA accommodation, the defendants' materials provide that the plaintiff has admiited that he never made a formal request for accommodation in accordance with that policy." Doc.

---

[1] Several months after Plaintiff's appeal was docketed, the **Civil Rights Division** of the U.S. Justice Department released its findings based on a comprehensive and searching inquiry into the Pennsylvania Department of Corrections' use of solitary confinement on prisoners with serious mental illness and intellectual disabilities. See Exhibit A as appended separately hereto in support of Plaintiff's appeal.

The methodology was based, in part, on an on-site inspection of six prisons in Pennsylvania. One of the six prisons included SCI-Dallas where Plaintiff has been housed since 1982. Id., p.4.

Quite significantly, the Justice Dept. found that not only did current prison practices violate the 8th Amendment's prohibition on "cruel and unusual punishments" with respect to 100s of prisoners; but also that it constituted a violation of the inmates' rights under various provisions of the ADA. Id.

60, p.5.

There are two arguments here. **No. 1**, for years prior to there being an articulated procedure for submitting a request to receive an accommodation under the DC-ADM 006, Plaintiff provided more than adequate notice going back to 1999 that he was seeking accommodations under the ADA.

For example, Appellant sent a formal request in August of 1999 to the prison's then-ADA coordinator, Patricia Ginocchetti, pursuant to the June 1999 DC-ADM 006 policy which went into effect on August 16, 1999. See **Exhibit** B and **Exhibit** C as appended separately hereto.[2]

This same packet of material was also sent to Robert S. Bitner, then Chief Hearing Examiner for the Dept. of Corrections. Under the aforementioned policy (**Exhibit** B) Bitner was "the Centralized ADA Coordinator." (_Id_. p.2) **See also Exhibit** D as appended hereto.

Bitner responded on Sept. 22, 1999, stating, in part, that "[t]he documentation you forwarded with your letter establishes your attempt to request accommodation in accordance with procedures outlined under DC-ADM 006. You now need to follow **VI A, 4(f)** of the policy, which stipulates that an inmate who has a disability that he or she believes is not being reasonably accommodated by the Department, may submit a grievance under DC-

---

[2] Presently, Appellant is not in possession of his entire file of discovery material from his previous counsel. This includes also Appellant's deposition transcript. Consequently, Appellant is not able to state precisely where in the record materials, as appended, can be found.

ADM 804." See Exhibit E as appended hereto. [Emphasis added.]

Thus, for years this was how the policy, then in place, was being implemented for an inmate to request an accommodation. All a person had to do, in essence, was to submit a formal grievance on the issue.

Pursuant to the instructions of Robert S. Bitner, Appellant continued to file subsequent grievances concerning his request for an accommodation. See e.g. Exhibit F as appended separately hereto (correspondence from Sharon Burks, Chief Grievance Officer, dated December 12, 2006, in re: Grievance No. 163137).

The foregoing should exemplify for this Court the efforts Appellant has been diligently pursuing now, for many years, to gain the requested relief and accommodations for his disabilities.[3]

Moreover, it should be abundantly clear that Appellant exhausted all reasonable means at his disposal to have this issue addressed.[4]

Prison officials at SCI-Dallas have had more than adequate notice that Appellant was seeking accommodations under their policy DC-ADM 006. Appellant should not have been required to

---

[3] By way of an additional example, Appellant has appended hereto a detailed chronology describing a pattern of ADA discrimination from April of 1999 to Sept. of 2005 — a period of more than 6 years. The chronology identifies a number of staff officials at SCI-Dallas Appellant has spoken to about his Z-code (single celling) issues. See Exhibit G as appended separately hereto.

[4] Through counsel, Appellant retained the services of an expert in forensic psychology. Appellant has appended hereto as Exhibit H an excerpt from the report of William F. Anzalone, Jr., Psy.D. Among other concerns, Appellant was diagnosed with three Axis I psychological diagnoses, i.e. PTSD, GAD, and Major Depressive Disorder. Id., p.3. Appellant is not certain if the Anzalone report was ever made part of the summary judgment record.

file yet another request under a newer, revised, version of the old policy in order to properly exhuasted his remedies under the PLRA.

No. 2, as to this argument, Appellant would respectfully maintain that the purpose of the PLRA should not be to exhaust the prisoner or otherwise give prison officials "free rein to stack the deck against inmates by resorting to any of the innumerable ways [in which] to stymie prisoners' efforts to navigate the administrative process." See Eugene Novikov, Stacking The Deck: Futility And The Exhaustion Provision Of The Prison Litigation Reform Act, 156 PaL 817, 818 (2008).

Moreover, it is very ironic to note that although the DOJ found that the Pennsylvania DOC routinely subjected hundreds of prisoners, with serious mental illness and intellectual disabilities, to 8th Amendment and Title II ADA violations, it is fair to surmise it would be extremely unlikely for one inmate, or even several inmates in either class, to properly exhaust an internal prison grievance challenging conditions of their confinement, or much less adequately prepare and file, pro se, a civil rights complaint in a Pennsylvania federal court.

B.    THE DISTRICT COURT COMMITTED LEGAL ERROR BY CONCLUDING THAT BECAUSE APPELLANT DID NOT SPECIFICALLY NAME EACH DEFENDANT IN HIS GRIEVANCES PRISON OFFICIALS WERE NOT ON NOTICE THAT THEY WERE BEING IMPLICATED WITH RESPECT TO HIS 8TH AMENDMENT AND ADA CLAIMS.

The District Court concluded "we agree with Defendants that [Appellant] did not sufficiently and properly exhaust his remaining Eighth Amendment claims.... Also, we note that

Pennsylvania's inmate grievance system does mandate that inmates name all relevant persons...an inmate will be in procedural default <u>unless he can adequately explain why he neglected to name a defendant in his grievance</u>." Doc. 57, p.24. [Emphasis added.]

Appellant submits that our Appeals Court's practice is to recognize that under the DOC's administrative review system, "a prisoner's grievance should identify specific persons, if practicable." <u>Joye Williams v. Superintendent Klopotoski, et al.</u>, 2012 U.S. Dist. LEXIS 175596 (Dec. 12, 2012)(citing <u>Spruill</u>, 372 F.3d at 234).

However, the District Court seems to overlook that "the prison's grievance process could excuse such a procedural default by identifying [an unnamed] person and acknowledging that [the person(s)] were <u>fairly within the compass of the prisoner's grievance</u>." <u>Id</u>. [Emphasis added.]

For example, in the <u>Williams</u> case, Judge Munley specifically noted (with respect to prison officials at SCI-Dallas) "the failure of Williams' grievance to specifically name Klopotoski, Mosier and Mahally does not by itself necessarily warrant entry of dismissal for non-exhaustion." <u>Id</u>.

Judge Munley further opined that "since the substance of [Williams'] pending claims against those Defendants was included in his grievance, the request for entry of summary judgment on the basis of non-exhuastion will be denied." <u>Id</u>.


## III. <u>CONCLUSION</u>

Based on the foregoing, particularly with respect to the District Court's conclusion regarding the exhuastion of Grievance No. 266652 as to Defendant Miskell,[5] Appellant humbly requests that his appeal be permitted to proceed.

Respectfully submitted,

Dated: 3/06/14

Dennis Hughes
Plaintiff/Appellant, **Pro Se**
#AM-5356, SCI-Dallas
1000 Follies Road
Dallas, PA 18612-0286

---

[5] It is very surprising that the District Court adopted the Defendants' characterization that in this grievance Appellant only complained about verbal abuse from Miskell. Doc. 57 at 23. However, the opening ¶ in this grievance stated that Miskel (and other named prison staff members) "have persisted over many years and presently [ ] providing inadequate mental health care by failing to address ongoing systematic mental health problems, improper[r] housing accommodations..." So the grievance, in actuality, was fairly expansive in scope and reviewed historical occurrences going back to Appellant's initial incarceration at SCI-Graterford in November of 1981.

## CERTIFICATE OF SERVICE

I, Dennis Hughes, the Plaintiff in the foregoing captioned matter (U.S. Appeals Court No. 13-4726), hereby certify that I have, on the date indicated below, caused to be served a true and correct copy of the foregoing document titled **APPELLANT'S CONCISE ARGUMENT IN SUPPORT OF HIS APPEAL** by depositing the same in the prison mailbox for delivery by U.S. Mail, FIRST CLASS postage prepaid, addressed as follows to the party below:

Raymond W. Dorian, Esq.
Assistant Counsel
Governor's Office of General Counsel
1920 Technology Parkway
Mechanicsburg, PA 17050


Dated: __3/26/14__

Dennis Hughes
Appellant, **Pro Se**
#AM-5356, SCI-Dallas
1000 Follies Road
Dallas, PA 18612-0286

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

DENNIS HUGHES,

     APPELLANT,

     v.             No. 13-4726

KEVIN MISKELL, ET AL.,

     APPELLEE

## APPELLANT'S EXHIBITS IN SUPPORT OF HIS APPEAL

PAGE(S)

EXHIBIT A:

     DOJ's INVESTIGATION OF THE PENNSYLVANIA
     DEPARTMENT OF CORRECTIONS' USE OF SOLITARY
     CONFINEMENT ON PRISONERS WITH SERIOUS MENTAL
     ILLNESS AND/OR INTELLECTUAL DISABILITIES;     28

EXHIBIT B:

     PENNA. DOC's POLICY:
     REASONABLE ACCOMMODATIONS FOR INMATES
     WITH DISABILITIES - DC-ADM 006,
     EFFECTIVE AUG. 16, 1999;     8

EXHIBIT C:

     PLAINTIFF'S REQUEST TO SCI-DALLAS ADA
     COORDINATOR, DATED AUG. 30, 1999;     4

EXHIBIT D:

     PLAINTIFF'S CORRESPONDENCE TO CENTRAL
     OFFICE ADA COORDINATOR, ROBERT
     S. BITNER, DATED SEPT. 21, 1999;     3

EXHIBIT E:

     CORRESPONDENCE OF ROBERT S. BITNER,
     CENTRAL OFFICE ADA COORDINATOR,
     DATED SEPT. 22, 1999;     1

PAGE(S)

**EXHIBIT F:**

CORRESPONDENCE/FINAL REVIEW DECISION OF
SHARON BURKS, CHIEF GRIEVANCE OFFICER,
AS TO 163137, DATED DECEMBER 12, 2006;                          1

**EXHIBIT G:**

PLAINTIFF'S CHRONOLOGY:
"DESCRIPTION OF DISCRIMINATION";                                2

**EXHIBIT H:**

EXCERPTS OF REPORT OF PLAINTIFF'S EXPERT,
WILLIAM F. ANZALONE, JR., PSY.D.                                3

TOTAL: 50

RESPECTFULLY SUBMITTED,

DATED: 3/24/14

DENNIS HUGHES
PLAINTIFF/APPELLANT, PRO SE
#AM-5356, SCI-DALLAS
1000 FOLLIES ROAD
DALLAS, PA 18612-0286

# ATTACHMENT

# "A"



U.S. Department of Justice

Civil Rights Division

_____

*Assistant Attorney General*
*950 Pennsylvania Ave, NW - RFK*
*Washington, DC 20530*

FEB 24 2014

The Honorable Tom Corbett
Governor's Office
225 Main Capitol Building
Harrisburg, PA 17120

Re:    <u>Investigation of the Pennsylvania Department of Corrections' Use of Solitary</u>
       <u>Confinement on Prisoners with Serious Mental Illness and/or Intellectual Disabilities</u>

Dear Governor Corbett:

    The Civil Rights Division has completed its investigation of the Pennsylvania
Department of Corrections' ("PDOC") use of solitary confinement on prisoners with serious
mental illness ("SMI") and intellectual disabilities ("ID"). The investigation was conducted
pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997.
CRIPA authorizes the Department of Justice to seek equitable relief where conditions in state
correctional facilities violate the rights of prisoners protected by the Constitution or laws of the
United States.

    We opened this systemwide investigation after having found that one of Pennsylvania's
prisons—the State Correctional Institution at Cresson—routinely subjected prisoners with
SMI/ID[1] to solitary confinement under conditions that violated their constitutional rights and
their rights under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C §§ 12131-
12134. We notified you of both our findings concerning Cresson and our decision to conduct a
systemwide investigation in a letter dated May 31, 2013 ("Cresson Findings Letter"). *See*
www.justice.gov/crt/about/spl/documents/cresson_findings_5-31-13.pdf.

    Our systemwide investigation found that the Commonwealth uses solitary confinement in
ways that violate the rights of prisoners with SMI/ID. However, it is important to note that in the
months since we issued our Cresson Findings Letter, the overall number of prisoners with
SMI/ID that PDOC subjects to solitary confinement has gone down. Moreover, PDOC's
leadership has been developing new policies that, if adopted and implemented, would further
reduce the number of prisoners with SMI/ID in solitary and improve mental health services for
prisoners with SMI. Nonetheless, <u>much more needs to be done</u>. Throughout the PDOC system,
hundreds of prisoners with SMI/ID remain in solitary confinement for months and sometimes

_____

[1]  We use the shorthand "SMI/ID" in this letter, but note that, while there is some overlap, most prisoners with SMI
do not have ID and vice versa.

years, with devastating consequences to their mental health, in violation of their rights under the Eighth Amendment and the ADA.

In our review, we looked at the totality of the conditions confronting prisoners in solitary and the presence or absence of mechanisms to mitigate harms arising from those conditions. To reach our investigative findings, it was necessary to assess the conditions in which prisoners were held, the practices of PDOC, the duration of confinement, the decisions made relating to security reasons and penological concerns, the available programs and services, and the precise harms found by our expert-consultants. We concluded that these conditions collectively violated the constitutional and statutory rights of prisoners with serious mental illness and intellectual disabilities.[2]

Throughout our investigation, Secretary John Wetzel and his staff have provided us with exceptional cooperation. We look forward to collaborating with them in the coming months to fashion an agreement between the United States and the Commonwealth that effectively addresses our shared concerns.

## I.    SUMMARY OF FINDINGS

PDOC has begun reforming the way in which it uses solitary confinement on prisoners with SMI/ID. In recent months, PDOC has implemented new procedures for the disciplinary process. It has also implemented new protocols for the treatment of prisoners with SMI in certain specialized housing units. These reforms have led to a reduction in the number of prisoners with SMI subjected to solitary confinement. Moreover, PDOC is in the process of drafting policies geared toward further reducing the number of prisoners with SMI/ID housed in isolation units and improving mental health care for prisoners with SMI. While the Commonwealth has made important improvements, much more work needs to be done to ensure sustained compliance with the mandates of the Constitution and the ADA. Below we summarize our factual determinations and our ongoing concerns:

- The manner in which PDOC subjects prisoners with SMI to prolonged periods of solitary confinement involves conditions that are often unjustifiably harsh and in which these prisoners routinely have difficulty obtaining adequate mental health care: In the one-year period between May 2012 and May 2013, PDOC confined more than 1,000 prisoners on its active mental health roster in solitary confinement for more than 90 days.[3] Nearly 250 of those prisoners were in solitary for more than a year. There are still roughly 115 prisoners PDOC identifies as having SMI who are in solitary. Our expert-consultants have concluded that the 115 number grossly understates the number of prisoners with SMI currently subjected to solitary confinement, estimating that there are hundreds more.[4] The

---

[2] In making these findings, the Department of Justice does not intend to suggest that every use of solitary confinement on persons with SMI/ID is a *per se* violation of the Eighth Amendment or the ADA.

[3] PDOC separates its active mental health roster into two categories: (1) those prisoners designated as having "the most serious need for mental health services;" and (2) those designated as having a "present mental health need."

[4] PDOC has newly revised its active mental health roster. It designates only those in the first category as having SMI. However, after reviewing medical records and interviewing prisoners, we and our expert-consultants in mental health have concluded that a very significant number of the prisoners currently designated as not having SMI

conditions that prisoners with SMI face while in solitary confinement are harsh. They are routinely confined to their cells for 23 hours a day; denied adequate mental health care; and subjected to punitive behavior modification plans, forced idleness and loneliness, unsettling noise and stench, harassment by correctional officers, and the excessive use of full-body restraints.

- **The manner in which PDOC uses solitary confinement on prisoners with SMI results in serious harm:** PDOC uses isolation on prisoners with SMI in a way that exacerbates their mental illness and leads to serious psychological and physiological harms. Indeed, our expert-consultants interviewed and reviewed the records of more than two dozen prisoners whom they concluded were seriously harmed by solitary confinement in various ways, including severe mental deterioration, psychotic decompensation, and acts of self-harm. For instance, even though only a small fraction of the prisoners at the prisons we toured were housed in solitary confinement units, most of the suicide attempts occurred in those units. Specifically, more than 70% of the documented suicide attempts between January 1, 2012 and May 31, 2013 occurred in the solitary confinement units.

- **Numerous systemic deficiencies contribute to PDOC's extensive use of solitary confinement on prisoners with SMI:** PDOC routinely resorts to using prolonged solitary confinement on those with SMI primarily because systemic deficiencies interfere with its ability to provide adequate mental health treatment. When we initiated our investigation in May, prisoners with SMI were placed in solitary confinement at twice the rate of prisoners without SMI. Too often, instead of providing appropriate mental health care, PDOC's response to mental illness is to warehouse vulnerable prisoners in solitary confinement cells.

- **The manner in which PDOC uses solitary confinement also harms prisoners with ID:** PDOC uses solitary confinement on a significant number of prisoners with ID, as defined below. Prisoners with ID are especially susceptible to the harmful effects of PDOC's use of solitary confinement. They have limited coping mechanisms and their mental health is prone to deteriorating when subjected to the stressors present in PDOC's solitary confinement units. We believe PDOC is not adequately addressing such concerns.

- **The manner in which PDOC uses solitary confinement often discriminates against prisoners with SMI/ID:** PDOC often unnecessarily and inappropriately places prisoners in solitary confinement because they have SMI/ID. Isolating prisoners on the basis of their SMI/ID without adequate justification constitutes impermissible discrimination and unjustifiably denies them access to services and programs provided to most other prisoners. PDOC has failed to make reasonable modifications to its policies, procedures, and practices to meet the needs of prisoners with SMI/ID in the most integrated setting appropriate to their needs and consistent with legitimate safety requirements. Instead, it has routinely elected to segregate these prisoners unnecessarily in its solitary confinement units.

PDOC's solitary confinement practices violate the Eighth Amendment's prohibition against "cruel and unusual punishments." Embodying "broad and idealistic concepts of dignity,

---

and thus are assigned to PDOC's second category indeed have SMI. We also identified other prisoners with SMI who are left off PDOC's active mental health roster entirely.

civilized standards, humanity, and decency," *Estelle v. Gamble*, 429 U.S. 97, 102 (1976), the Amendment prohibits officials from disregarding conditions of confinement that subject prisoners to an excessive risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 843 (1994). PDOC's use of a harsh form of solitary confinement for extended periods of time on hundreds of prisoners with SMI/ID constitutes precisely the type of indifference to excessive risk of harm the Eighth Amendment prohibits.

The practices described in this letter also violate the ADA. The ADA prohibits prisons from discriminating against prisoners with disabilities. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a). It generally obligates prisons to provide qualified prisoners with disabilities the opportunity to participate in and benefit from prison services, programs, and activities, and, absent legitimate justification, to do so in the most integrated setting appropriate to individual prisoners with disabilities. *See* 28 C.F.R. §§ 35.130(a), (d), 35.150, 35.152; *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998); *Chisolm v. McManimon*, 275 F.3d 315, 324-25 (3d Cir. 2001). PDOC uses solitary confinement in a way that is at odds with these requirements.

## II.    METHODOLOGY, DEFINITIONS, AND BACKGROUND

### A.    Methodology

In August 2013, we conducted on-site inspections of six PDOC prisons.[5] We conducted the tours with the assistance of two expert-consultants in mental health treatment, suicide prevention, and the effects of solitary confinement. We interviewed PDOC leadership, administrative staff members, security staff members, medical and mental health staff members, and prisoners. We reviewed documents related to the use of solitary confinement at all 26 of the Commonwealth's prisons before, during, and after our site visits. These include policies and procedures, medical and mental health records, cell histories, incident reports, disciplinary reports, suicide reviews, and unit logs. We also observed prisoners in various settings throughout the facilities. Consistent with our commitment to providing technical assistance and conducting a transparent investigation, we conducted exit conferences after each of our on-site inspections.

### B.    Definitions

Terms we use throughout this letter are defined as follows:

- "Isolation" or "solitary confinement" means the state of being confined to one's cell for approximately 23 hours per day or more.

- "Solitary confinement unit" or "isolation unit" means a unit where either all or most of those housed in the unit are subjected to solitary confinement.

- "Serious mental illness" or "SMI" means "a substantial disorder of thought or mood that significantly impairs judgment, behavior, [or] capacity to recognize reality or cope with the ordinary demands of life." Pa. Dep't of Corr., *Access to Mental Health Care,*

---

[5] One of the prisons we toured—SCI Greene—is the facility using solitary confinement on the greatest number of prisoners by far. We also toured SCI-Fayette, SCI-Smithfield, SCI-Rockview, SCI-Muncy, and SCI-Dallas.

*Policy 13.8.1., Section 2-Delivery of Mental Health Services* § A.1.a.(2) (2013) (we note that for this letter we have adopted PDOC's own definition of SMI).

- "Intellectual disability" or "ID" means a disability characterized by both a significant impairment in cognitive functioning, and deficits in adaptive functioning, such as communication, reasoning, social skills, personal care, and organizing school or work tasks. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 33 (5th ed. 2013). An intellectual disability begins before the age of 22 and is chronic. As a substantial number of inmates may have some lesser form of ID, for the purposes of this letter, ID will refer to having a highly significant impairment of functioning, generally indicated by an IQ score of 70 or below, that would be adversely impacted by prolonged placement in a solitary confinement unit.

## C.    Background

PDOC operates 26 facilities, housing approximately 50,000 prisoners. PDOC subjects at least 2,800 of those prisoners—roughly 6% of the system's prisoners—to solitary confinement.

Roughly 2,400 of those in solitary are housed in Restricted Housing Units ("RHU"). Prisoners are housed in RHUs for violating prison rules (disciplinary segregation) or to protect the security of the prison or the individual prisoner (administrative segregation). Prisoners in the RHUs are usually confined to their cells for roughly 23 hours a day.

Another 400 prisoners are housed in one of the following types of solitary confinement units: a unit of Psychiatric Observation Cells ("POC") (for prisoners who are mentally decompensating to the point of being considered a danger to themselves, other prisoners, and/or property); the Capital Case Unit ("CCU") (for prisoners who have been sentenced to death); the Special Management Unit ("SMU") (for prisoners who exhibit behavior that presents a risk to the orderly running of the prison); and the Secure Threat Group Management Unit ("STGMU") (for prisoners who pose a risk to the prison because of their affiliation with, and active involvement in, gangs).[6]

Until recently, PDOC used solitary confinement on many of the approximately 70 prisoners housed in its Secure Special Needs Units ("SSNUs"). The SSNUs were used to house prisoners with SMI who had a history of disciplinary infractions. Within the last couple of months, PDOC has eliminated its SSNUs, replacing them with Secure Residential Treatment Units ("SRTUs"). PDOC has represented to us that it does not intend to use solitary confinement on any of the prisoners housed in its new SRTUs.

---

[6] Until this summer, prisoners in the CCU were confined to their cells for roughly 23 hours a day. In recent months CCU prisoners have been permitted one additional hour of recreation time per day. Prisoners in POC are confined to their cells for approximately 24 hours per day. Most prisoners housed in SMUs and STGMUs spend at least 23 hours a day in their cells. A small minority of the prisoners housed in SMUs and STGMUs are allowed a few additional hours of out-of-cell time per week after progressing to the least-restrictive part of these units' step-down programs.

## III.   DISCUSSION

A.    PDOC has begun to address the way in which it uses solitary confinement on prisoners with SMI and to improve its mental health care practices.

In recent months, PDOC has been reforming its solitary confinement practices. Currently, PDOC is preparing draft policies that, if correctly implemented, may reduce the number of prisoners with SMI subjected to prolonged isolation and improve the mental health care for this population. Moreover, during the summer, PDOC started to implement changes even though policies have not been finalized or adopted. Those changes include: (1) involving mental health staff members in the disciplinary process when the prisoner has SMI; (2) training a significant number of staff members in crisis intervention; (3) converting SSNUs that functioned like isolation units into SRTUs that provide more treatment, out-of-cell activities, and positive incentives; and (4) training and using peer specialists in some PDOC facilities to provide additional support to prisoners with SMI housed in general population.

These initial reform efforts are already producing positive results. Over a three month period this summer, PDOC reduced the number of prisoners with SMI in solitary confinement by well over 100.[7] Our expert-consultants found that these changes have dramatically improved the mental health of those removed from solitary. For example, one prisoner who had spent many months in an RHU and is now housed in an SRTU told us that "he came to hate himself" when he was in solitary, and that he now feels much better because he can more regularly get out of his cell. He also noted that he has greatly benefited from group therapy in the SRTU, where he can talk to prisoners facing similar difficulties. Line-staff members have also noted the positive changes. For instance, a staff psychologist commented on how she has recently seen a marked reduction in negative behaviors by prisoners as out-of-cell activities have increased.

Although progress has been made, there is still work to be done. Many of our major findings concerning the way in which Cresson misused solitary confinement still apply with equal force to the PDOC system as a whole. In the following sections, we discuss these serious, ongoing problems with the manner in which PDOC uses solitary confinement on prisoners with SMI. We also discuss the systemic failures that remain in place and contribute to PDOC's excessive reliance on solitary confinement as a control tool.[8]

B.    The manner in which PDOC continues to use solitary confinement on prisoners with SMI violates their rights under the Eighth Amendment to the U.S. Constitution.

Despite the progress that has been made in recent months, we find that the manner in which PDOC continues to use solitary confinement on prisoners with SMI violates the Eighth Amendment's prohibition against punishments that are "cruel and unusual." There is no static test for determining whether conditions are "cruel and unusual." Instead, the Eighth Amendment

---

[7]  As we noted in the Summary of Findings section, PDOC has identified roughly 115 prisoners with SMI presently housed in solitary confinement units. Our expert-consultants have concluded that this number grossly underestimates the actual number of prisoners with SMI/ID still in solitary.

[8]  In December 2013, PDOC officials reported to us progress they felt had been made since our August inspections. These efforts included beginning to review serious injurious behaviors, establishing suicide prevention committees at each facility, accelerating crisis intervention training schedules for officers, and drafting a proposal to have an independent organization conduct a segregation reduction project on all prisoners regardless of their vulnerabilities.

"must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).

By subjecting prisoners with SMI to prolonged periods of solitary confinement under harsh conditions that are not necessary for legitimate security-related reasons, PDOC exposes them to an excessive and obvious risk of serious harm. *See Farmer*, 511 U.S. at 828; *Hope v. Pelzer*, 536 U.S. 730, 738-745 (2002) (holding that prison officials show deliberate indifference where they disregard obvious risks to prisoner safety). Moreover, our expert-consultants observed that as a direct result of these practices, prisoners with SMI have suffered serious psychological and physical harms, including psychosis, trauma, severe depression, serious self-injury, and suicide. *Cf. Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir. 1992) ("The touchstone is the health of the inmate. While the prison administration may punish, it must not do so in a manner that threatens the physical and mental health of prisoners.").

1. PDOC subjects prisoners with SMI to prolonged periods of solitary confinement under harsh conditions where they routinely have difficulty obtaining adequate mental health care, which in combination pose an excessive risk to the mental health of prisoners.

The manner in which PDOC uses solitary confinement involves a number of factors that in combination violate the Eighth Amendment. *See Peterkin v. Jeffes*, 855 F.2d 1021, 1024-25 (3d Cir. 1988) (holding that the district court appropriately considered the "totality of conditions" when assessing the constitutionality of Pennsylvania's death row unit, where prisoners were confined to their cells for approximately 22 hours per day). We did not consider any individual factor to be determinative. Instead, we assessed the constellation of conditions in PDOC's solitary confinement units and the harms found by our expert-consultants that resulted from these conditions and practices.

In reaching our conclusion, we considered the following factors:

(1) the length of time prisoners with SMI spent in solitary confinement;

(2) the extent to which the use of solitary confinement on prisoners with SMI interfered with staff members' ability to provide adequate mental health care; and

3) the unjustifiable harshness of the conditions that attended PDOC's use of solitary confinement on prisoners with SMI.

First, the manner by which PDOC routinely subjects prisoners with SMI to lengthy periods of solitary confinement involves conditions that our expert-consultants found subjected prisoners to harm or an unreasonable risk of harm and contributes to the Constitutional violation. As one court noted, long periods of isolation for those with SMI can be "the mental equivalent of putting an asthmatic in a place with little air to breathe." *Madrid v. Gomez*, 889 F. Supp. 1146, 1265-66 (N.D. Cal. 1995); *see also* Am. Psychiatric Ass'n, *Position Statement on Segregation of Prisoners with Mental Illness* (2012) ("Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates."); *Morris v. Travisono*, 499 F. Supp. 149, 160 (D.R.I. 1980) (noting that "[e]ven if a person is confined to an air conditioned suite at the Waldorf Astoria,

7

denial of meaningful human contact for . . . an extended period of time may very well cause severe psychological injury"); *United States v. Bout*, 860 F. Supp. 2d 303, 308 (S.D.N.Y. 2012) ("It is well documented that long periods of solitary confinement can have devastating effects on the mental well-being of a detainee.").

From May 2012 to May 2013, over 1,000 prisoners identified on PDOC's active mental health roster spent three or more continuous months in solitary confinement. Nearly 250 of these prisoners have been in solitary confinement for more than a year. Most of these prisoners were held in an RHU or one of the other solitary confinement units.

For many with SMI, PDOC's use of prolonged isolation is mentally taxing because they can see no end point to it. We interviewed many prisoners with SMI who told us they believed they would never get out of solitary. Some told us that they had accumulated years of disciplinary time in the RHU and feared they would never be returned to general population. Others explained that they had lost all faith in their ability to conform their conduct to the prison's rules in a way that would allow them out of their isolation cell.

Second, the manner in which PDOC uses solitary confinement interferes with its ability to provide adequate mental health treatment to prisoners with SMI and contributes to the Constitutional violation. *See Coleman v. Wilson*, 912 F. Supp. 1282, 1320-21 (E.D. Cal. 1995) (adopting the magistrate judge's conclusion that "inmates are denied access to necessary mental health care while they are housed in [solitary confinement]"). Appropriate mental health treatment for prisoners with SMI should involve much more than medication. Nat'l Comm'n on Corr. Health Care, *Standards for Mental Health Services in Correctional Facilities*, § MH-G-02 (2008). Prisoners with SMI must also have, among other things, "programming or appropriate therapies (or both) to meet the mental health needs of patients." *Id.*[9] Unfortunately, for much of last year, hundreds of prisoners with SMI spent months in solitary confinement receiving only medication and occasional "cell-side" visits from mental health staff members, even though our expert-consultants found more care was needed for those inmates.[10]

Recently, staff psychologists at many of the prisons have started to conduct at least one out-of-cell therapy session per month for prisoners with SMI currently housed in an isolation unit. This approach constitutes a significant improvement over past practices.

However, PDOC continues to use practices that fail to ensure that prisoners with SMI in solitary confinement receive the mental health treatment they need. *Cf. Casey v. Lewis*, 834 F. Supp. 1477, 1547-49 (D. Ariz. 1993) (describing the inappropriate use of isolation for prisoners

---

[9] According to our consultants, prisoners with SMI may also need regular and meaningful counseling from mental health staff members, peer and other counseling skill building, and structured and unstructured activities. Activities may include eating out of cell, outdoor recreation, and showers. They explain that these types of activities provide opportunities for both socializing and organizing one's life in the facility in a way that is therapeutic and important to the health of prisoners with SMI.

[10] A cell-side visit typically involves a member of the mental health staff standing outside a prisoner's cell, attempting to speak to the prisoner through a food tray slot or cracks in a doorframe amid the commotion on the unit. Such a visit typically lasts for only a few minutes at a time, lacks confidentiality, and cannot be equated with a face-to-face, out-of-cell consultation/therapy session. As one staff member explained, "You can't do therapy in a hallway."

with serious mental illness because "[d]uring lockdown, inmates are provided improper mental health care or no mental health care").

PDOC also uses solitary confinement in a way that interferes with staff members' ability to identify prisoners who are mentally deteriorating in their cells. The problem is particularly acute for under-diagnosed prisoners not on the mental health roster. One former staff psychologist explained that he found it difficult to appropriately assess the condition of prisoners in solitary confinement. He emphasized that his manager discouraged him from doing anything other than cursory cell-side assessments of prisoners' mental health. He noted that for inmates who were inactive and in their cells most of the time, it was next to impossible to fully assess the condition of prisoners from cell-side without an out-of-cell visit.

Third, unjustifiably harsh conditions often attend PDOC's use of prolonged solitary confinement on prisoners with SMI. In combination, these conditions are dehumanizing and cruel and contribute to the Constitutional violation. *See Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (holding that when conditions of confinement combine to "have a mutually enforcing effect that produces the deprivation of a single, identifiable human need," they violate the Eighth Amendment); *see also Hoptowit v. Ray*, 682 F.2d 1237, 1247 (9th Cir. 1982) ("[T]he court must consider the effect of each condition in the context of the prison environment, especially when the ill effects of particular conditions are exacerbated by other related conditions."). While conditions for those housed in PDOC's solitary confinement units vary somewhat by prison, there are consistent themes. PDOC's prisons consistently subject prisoners with SMI to not just prolonged isolation, but also unnecessarily harsh and disorienting housing conditions, punitive behavior modification plans, and the excessive use of full-body-restraints. These conditions serve only to exacerbate their mental illness. We discuss these conditions below:

*Harsh conditions:* Although by its nature solitary confinement typically includes aspects that would be considered harsh in the ordinary sense of the word, the particular use of solitary confinement on inmates with SMI in the PDOC system, when examined under the totality of the circumstances, includes unjustifiably harsh conditions, even though some of these conditions, standing alone, might not be inappropriate in other circumstances. Every prisoner placed in solitary confinement must spend almost his entire day confined to a cell that is less than 100 square feet in size—about the size of an average American bathroom. The cell contains a metal bed frame, a thin plastic mattress, metal sink, metal toilet, and metal desk with an attached metal seat, and sometimes a small shelf. At some of the prisons, the cell will also have a small exterior-facing window, but at many of the prisons, the cell has no exterior window and no natural light coming directly into it. Usually, the prisoner is locked in his cell behind a solid metal door. The door has a narrow slot (used for passing food trays and for handcuffing the prisoner before he can leave the cell), and a small plastic window with a view to either a hallway or the housing unit's common area.

The lighting in the cell can be dimmed, but it can never be turned off, even at night. The noise level can be high, even at night, because of the yelling and banging of neighboring prisoners. The prisoner with SMI in solitary confinement in PDOC has limited out-of-cell time. Typically, he is allowed, at most, one hour in an empty and caged outdoor pen, five times a week, and a 15-minute shower three times a week. Recently, conditions for the prisoner PDOC has identified as having SMI also often includes one out-of-cell therapy session per month with a staff psychologist.

9

Before he can leave his cell, a prisoner must first submit to a strip search. Further, to get from his cell to an out-of-cell activity, the prisoner is at all times escorted by correctional officers and has his arms and legs shackled together. Many prisoners we spoke to told us that they rarely leave their cells because of these procedures. They explained that being strip searched, handcuffed, and led by two corrections officers made them feel like animals. The female prisoners told us that the strip searches remind them of past sexual abuses.

Our expert-consultants found that in the solitary confinement units, conditions for the prisoner with SMI also routinely involve unnecessarily forced idleness and loneliness, where the idleness was unjustified by legitimate penological goals and not mitigated. For instance, looking at the totality of the circumstances, the prisoner with SMI in disciplinary custody at an RHU generally has no access to television or radio; has only limited access to reading materials; cannot make telephone calls (with the exception of emergency calls approved by management); is denied contact visitation privileges; is denied any opportunity to have non-contact visits with friends; and, at most, can only have one non-contact visit per month with an immediate family member, lasting for no longer than an hour.[11]

Living conditions in the RHU routinely involve a mix of disorienting and uncomfortable sensory experiences. For example, the air quality is often poor because of inadequate sanitation and ventilation. At one of the solitary confinement units we visited where the sanitation was especially bad, prisoners complained *en masse* to us about the smell of the place. A prisoner there explained, "The smell is terrible. When a prisoner smears feces on the walls, it's often left like that for days and the entire pod reeks of shit and makes you want to vomit."

*Punitive responses to symptoms of mental illness*: In most of the solitary confinement units we toured (which were mainly RHUs), staff members routinely respond to the prisoner exhibiting symptoms of his mental illness by making his living conditions even more inhospitable. Prisoners with SMI in the solitary confinement units frequently engage in behaviors that may be signals of mental illness instead of intentional misbehavior, such as smearing fecal matter on their cell walls or repeatedly failing to comply with prison rules, including minor infractions like where to stand in the cell when receiving meals. All too often corrections officers respond to behaviors that signal mental illness not by seeking to ensure that the inmate received adequate mental health treatment, but instead by imposing additional restrictions on the conditions of the prisoners' confinement. Restrictions can include harsh measures, such as unjustifiably requiring the prisoner to remain confined to his cell 24/7; denying the prisoner bedding material or running water and taking away the prisoner's clothes. Corrections officers are empowered to impose these restrictions for up to seven days at a time without conferring with mental health staff members and with nothing other than the approval of the unit's shift commander.

Corrections staff members also use housing assignments within the solitary confinement units as a way to punish prisoners for conduct related to their mental illness. For instance, in one of the RHUs, we found an unusually narrow cell that had no furniture in it other than a bed. When we asked about the cell, the corrections staff members at the unit assured us that prisoners

---

[11] We do note, however, that it is appropriate for a correctional system to remove privileges as a part of the disciplinary process.

were never assigned to the cell for more than a couple of days at a time, and then only for their own safety. However, our records review confirmed the allegations of the prisoners on the unit who had told us that a prisoner with SMI had been housed in the cell for nearly half a year.

At all of the facilities we toured, prisoners with SMI in the solitary confinement units complained of officers verbally abusing them. Some prisoners alleged that officers had encouraged them to kill themselves. For instance, one prisoner with SMI alleged that as recently as July 2013, when he tied a bedsheet to his vent and stood on his toilet preparing to kill himself, a group of officers encouraged him to go through with it. According to the prisoner, the officers told him that they "wanted to see his feet dangling," and chanted, "1 . . . 2 . . . 3 . . . kill yourself," repeatedly.[12]

Prisoners also alleged that officers working the solitary confinement units intentionally provoke prisoners with SMI into acting out. The prisoners claimed that the officers "push the buttons" of prisoners with SMI so as to have a basis for imposing additional restrictions on their conditions.

*Unnecessary and excessive use of restraints*: Excessive uses of full-body restraints often attend the use of solitary confinement on prisoners with SMI. Full-body restraints are a type of restraint that should only be used in exigent circumstances, and only for the briefest time necessary to ensure the safety of the prisoner or those around him. *See Cresson Findings Letter* at 16-18. According to our consultants, corrections officers should rarely have to use a full-body restraint on a prisoner for anywhere close to seven hours. Nonetheless, of the more than 260 full-body restraint incidents between January 2012 and June 2013, almost 75% lasted longer than 7 hours, and 15% lasted longer than 12 hours. This data, along with our review of the records related to PDOC's uses of restraints, indicate that corrections officers routinely use full-body restraints for far longer than is needed to avoid harm. Instead, they often appear interested in using the restraints as a means to discipline prisoners by causing discomfort or pain.

In sum, we have identified three factors indicating that PDOC uses solitary confinement in a way that poses an excessive and obvious risk of harm to prisoners with SMI. First, PDOC often uses solitary confinement on vulnerable prisoners with SMI for prolonged periods of time. Second, PDOC uses solitary confinement on prisoners with SMI in a way that frequently interferes with its ability to provide them with the mental health care they need. And third, extreme conditions—such as the excessive use of full-body restraints—routinely attend PDOC's use of solitary confinement on prisoners with SMI.

2. The way in which PDOC uses solitary confinement on prisoners with SMI has resulted in serious harm.

The way PDOC uses solitary confinement on prisoners with SMI has led to serious harm. At the prisons we visited, a disproportionate amount of the self-harm continues to occur in the isolation units, just as it did in Cresson. Between January 1, 2012 and May 31, 2013, although only a small fraction of PDOC's prisoners were housed in one of the solitary confinement units, 206 of the 288 documented suicide attempts occurred there. Our expert-consultants interviewed and/or reviewed records of more than two dozen prisoners who they have concluded were

---

[12] Prisoners housed in nearby cells provided accounts of the incident that were substantially consistent with what this prisoner had told us.

directly harmed by their conditions in solitary confinement in various ways, including mental deterioration, increased psychosis, and acts of self-harm and suicide.

Below we discuss the experiences of two of the individuals our expert-consultants interviewed in greater detail to illustrate the types of harms prisoners are suffering as a consequence of the way in which PDOC uses solitary. The first case involves a prisoner PDOC initially identified as having SMI, who PDOC held in solitary confinement for roughly ten months. The expert-consultant who interviewed the prisoner and reviewed his records concluded that the way in which solitary confinement was used on him led to a deterioration in his mental health and to suicide attempts.

The second case involves a prisoner who went into solitary confinement without SMI. According to a former staff psychologist we spoke to, PDOC failed to identify him as someone in need of treatment mainly because PDOC uses solitary confinement in a way that interferes with its ability to effectively screen for mental illness. Now, after many years in solitary, this prisoner has schizophrenia and has difficulty speaking in complete sentences. According to the expert-consultant who interviewed this prisoner and reviewed his records, this prisoner's decompensated state is principally attributable to his experiences in solitary confinement.

### Example 1 – Prisoner AA[13]

In February 2013, Prisoner AA—who has a mood disorder, an IQ of 66, and is on PDOC's mental health roster—attempted to hang himself after more than five months in solitary confinement in the facility's RHU. After his suicide attempt, staff moved him to a POC for one day, and then returned him to the RHU. After another roughly five months in solitary confinement in the RHU, Prisoner AA again attempted to hang himself. Fortunately, a week before we toured the facility, Prisoner AA was transferred to the SRTU. Conditions there are markedly better. Prisoner AA is no longer subjected to solitary confinement. He receives much more mental health care treatment, and his mental health has improved considerably.

According to one of our expert-consultants who interviewed Prisoner AA and reviewed his medical records, at the time of his suicide attempts, Prisoner AA exhibited symptoms consistent with a type of delirium that can result from subjecting a prisoner with SMI to prolonged isolation under certain conditions. Prisoner AA had told our consultant that while in the RHU, he became hypersensitive to sights and sounds. He also experienced visual hallucinations. For instance, he recalled sometimes seeing his deceased brother encouraging him to cut himself and "come join me." Prisoner AA also told our expert-consultant that when he experienced visual hallucinations of his brother, guards laughed at him and walked away, instead of referring him to psychology. He explained that in the RHU he became really depressed, and that his feelings of hopelessness made him want to kill himself and act out against the guards.

Finally, while Prisoner AA was in solitary, staff failed to pay sufficient attention when Prisoner AA expressed his intent to kill himself. For instance, records establish that before his second suicide attempt, Prisoner AA told staff he wanted to kill himself because they were ignoring his requests for a change in medication. The record also shows that just prior to his suicide attempt, Prisoner AA also "asked to see Psychiatry for a week and a half and . . . was

---

[13] To protect the identity of prisoners, we use coded initials.

tired of waiting to be seen." Notably, the facility did not have a full-time psychiatrist at the time.

### Example 2 – Prisoner BB

Prisoner BB has been imprisoned in PDOC for approximately 25 years. For almost all of that time he has been housed in solitary confinement. BB had no mental illness when he entered the prison system. On his initial evaluation, he was described as friendly, motivated to engage in educational activities (he was functionally illiterate), and unlikely to be a problem while incarcerated. After spending years in solitary, his mental health has badly deteriorated. Prisoner BB is floridly psychotic, disorganized, and unable to take care of his own personal hygiene and nutrition. He is locked in a cycle of chaotic behavior, mental deterioration, and disciplinary infractions.

According to our expert-consultant who interviewed Prisoner BB and reviewed his medical records, he has received virtually no mental health treatment while in solitary. Twice (in 2008 and 2012) his condition so deteriorated that he was admitted to an off-site inpatient unit that provides intensive mental health treatment. On admission, the records reflected that he had bizarre speech, disorganized behavior, extremely poor hygiene, and was responding to hallucinations. On both occasions, he improved dramatically while receiving the intensive care at the off-site inpatient unit. Instead of recognizing that his improvement confirmed that solitary confinement was harming his mental functioning, PDOC viewed it as evidence that he had faked or "malingered" mental illness while in solitary. After each of his brief stays at the off-site inpatient unit, Prisoner BB was returned to solitary.

As recently as April 2013, Prisoner BB was not on PDOC's active mental health roster and remained in solitary confinement. Fortunately, a week prior to our tour he was placed on the roster and recommended for admission to a psychiatric unit "to gain a better understanding of what mental illness, if any is present."

When we first encountered Prisoner BB in the RHU, we noted that the floor of his cell was covered in food. When our expert-consultant interviewed him, he mumbled that he was fine. Yet quite clearly he was not. He appeared disheveled and confused, trembled in fear, and was almost incoherent.

To compound matters, we were told by multiple prisoners that BB is often harassed by corrections officers because of his delusions and incoherence. According to our consultant, an environment such as this makes it more difficult to develop an alliance for medication compliance.

One psychologist we spoke to told us that when he had earlier raised the issue of BB's mental instability with his supervisor, the supervisor had "turned a blind eye" to the situation. The psychologist told us that he was very concerned about Prisoner BB's mental deterioration, but that his supervisor was of the view that the monthly cell-side check-in psychologists provided to all prisoners in Prisoner BB's solitary confinement unit would constitute adequate mental health care for this prisoner.

13

These examples speak to the harm that has been directly caused by the specific manner in which PDOC uses solitary confinement on prisoners with SMI.

Though many of the prisoners with SMI have become too ill to describe their mental suffering while in solitary, many others were eager to tell us how solitary had harmed them. One prisoner told us, "I feel like it's hard for me to breathe here. I feel claustrophobic . . . I feel trapped . . . I feel angry inside . . . I feel like giving up. I'm helpless behind the door." Another simply told us, "It's just a black hole. They put you back here and leave you." A prisoner with SMI who is now doing well in general population told us that in solitary he used to think a lot about "pounding [his] head against the wall." Another prisoner with SMI still in solitary told us, "The only way you can talk to someone or get something done is if you try to kill yourself."

C.     Systemic deficiencies undermining PDOC's mental health program pose an excessive risk of harm to prisoners and contribute to PDOC's overreliance on solitary confinement as a means of controlling prisoners with SMI.

Instead of having systems in place to ensure adequate mental health care throughout its facilities, PDOC uses isolation to control prisoners with mental illness as they become more ill and less stable. The structural deficiencies plaguing PDOC's mental health care system include inadequate: (1) continuity and coordination of care; (2) standing for mental health staff members; (3) criteria for assessing mental illness; (4) treatment capacity; and (5) oversight tools. These deficiencies lead to the unconstitutional use of isolation on prisoners with SMI, and pose a serious and obvious risk of harm to prisoners. *See Estelle*, 429 U.S. at 103-05; *Inmates of Allegheny County v. Pierce*, 612 F.2d 754, 761-63 (3d Cir. 1979) (holding that the Eighth Amendment prohibits deliberate indifference to prisoners' serious mental health care needs).

1.     Poor coordination and continuity of care leads to inadequate mental health care treatment and the use of solitary confinement on prisoners with SMI.

Systemwide problems concerning coordination and continuity of care among staff members have impeded PDOC's ability to provide adequate mental health care. Poor continuity of care leads to more prisoners becoming mentally unstable. It also means that PDOC staff members are less able to identify how mental instability contributes to prisoners' conduct and more likely to resort to the use of solitary confinement as a control tool.

PDOC's mental health staff members routinely fail to coordinate with each other. This can result in confusion over diagnoses and a failure to follow treatment plans. For example, in one record we reviewed, a psychiatrist prescribed a medication for a prisoner only to have a different psychiatrist discontinue it at the next meeting and prescribe another medication with no explanation for the abrupt change. On at least one occasion, when we asked staff members about a treatment mistake that had led to harm, they each disavowed responsibility and blamed one another.

Poor recordkeeping also hampers continuity and coordination of mental health care. Prisoner records are regularly missing vital mental health information, including information concerning diagnoses, prior treatment, medications, and family history of psychiatric disorders. Moreover, the mental health information PDOC does have is routinely scattered in different places not readily accessible to mental health staff members.

14

Our consultants identified many instances where inadequate continuity of care resulted in harm to prisoners. In one example, a staff member's failure to consider medications that had worked in the past for a prisoner led to the prisoner acting out in ways characteristic of bipolar disorder. PDOC staff members responded to the prisoner's behavior by disciplining him with time in the RHU. In solitary, he decompensated badly and attempted suicide.

2. **Inadequate consideration given to the views of mental health staff members often leads to assignment of prisoners with SMI to solitary confinement units.**

Systemwide, PDOC must do more to expand the role of mental health staff members in determining the conditions of confinement for prisoners with SMI. For instance, while we applaud PDOC's recent effort to enhance mental health staff members' role in the disciplinary process, that role is limited and not always credited in determining whether to house prisoners with SMI in solitary confinement units. For prisoners with SMI, mental health clinicians should have a large role in housing decisions because they have the clearest sense of how such prisoners will be affected by a particular housing placement.

Some mental health staff members we interviewed expressed frustration and resentment at the lack of respect shown to them by security staff members. They complained about the extent to which security staff members feel at liberty to ignore their recommendations.

3. **Difficulties in recognizing how mental illness may cause maladaptive behaviors leads to the inappropriate use of solitary confinement on prisoners with SMI.**

If PDOC is to avoid subjecting prisoners to solitary confinement for engaging in conduct related to their illness, it will have to ensure that its staff members, especially mental health staff members, can recognize the effects of mental illness when they see them. Our review of mental health records reveals a disturbing tendency by many of PDOC's clinicians to describe almost all disruptive conduct as purely willful and behavioral, and to overlook the role of the prisoner's mental instability in causing the conduct. Our consultants found cases of maladaptive behavior rooted in mental instability that PDOC's mental health staff members incorrectly characterized as "manipulative" or "malingering" behavior.

4. **PDOC needs to commit more resources to mental health services in both general population and its specialized housing units to avoid warehousing prisoners with SMI in solitary.**

PDOC holds large numbers of prisoners with SMI in solitary, in part, because it devotes insufficient resources to mental health care. If PDOC had more staff members to provide adequate care in general population, fewer prisoners would deteriorate to the point of having to be placed in isolation. PDOC must have an adequate number of mental health staff members and therapeutic beds to provide prisoners with the care they need.

Inadequate staffing is a problem throughout PDOC's mental health system. Our mental health expert-consultants found that at each of the facilities they visited, clinicians had large, unmanageable caseloads due to understaffing. For example, one facility we toured is supposed

15

to have seven full-time psychologists, but has only four.[14] An experienced psychologist we interviewed there expressed the belief that, even if the facility filled all seven slots, at least three more staff members would be needed to provide adequate care given the needs at this particular facility.

Resource constraints also prevent prisons from transferring prisoners to settings with more intensive mental health treatment. Mental health staff members we spoke to told us that they sometimes hold back on recommending transfers to such units because of a perception that bed space is limited. Further, delays occur because already-stretched mental health staff members must complete lengthy referrals for PDOC's review before transfers to therapeutic units can occur. If approved, prisoners must then wait for a bed to become available. Each delay adds to the time prisoners wait in solitary confinement without the mental health care they need. *Cf. Brown v. Plata*, 131 S. Ct. 1910, 1928 (2011) (recognizing that prolonged isolation may result in inappropriate delays in the provision of mental health care).

The need for more mental health staff members will only increase if PDOC follows through with its plans to have mental health staff members conduct more out-of-cell sessions in the solitary confinement units. Plans to expand the amount of mental health services provided in the new SRTUs will also require more staff.

5. **PDOC lacks essential oversight tools to identify harms caused by inadequate mental health care and its overreliance on solitary confinement.**

PDOC continues to lack key oversight mechanisms that would identify and address the harmful effects of solitary confinement and ensure the provision of adequate mental health care. We detailed at length in our Cresson Findings Letter how these essential oversight mechanisms did not exist and how this contributes to the system's dangerous use of solitary confinement. *See Cresson Findings Letter* at 26-31. PDOC's plans to begin tracking and analyzing mental health-related information remain aspirational. Currently, PDOC does not track the number of prisoners with SMI in solitary confinement units; does not examine the role of solitary confinement in causing suicides; does not track self-injurious behavior; does not critically review serious self-injuries; and does not track or analyze the additional punitive responses that prisoners with SMI experience in solitary confinement units, including, for example, use of force, food loaf, and hardened cells. This flawed oversight system prevents PDOC from identifying and correcting harms to prisoners.

D. **PDOC's use of solitary confinement also poses an excessive risk of serious harm to prisoners with ID.**

In the course of our investigation, we encountered prisoners with ID housed in PDOC's solitary confinement units. Most of these prisoners also have SMI. According to our expert-consultants, some of these prisoners are especially susceptible, because of their limited coping mechanisms, to the harsh conditions of solitary confinement at PDOC. For example, we spoke to a prisoner who felt especially empty and lonely while in solitary because reading was the only

---

[14] In the past year, this same facility went eight months without a full-time psychiatrist. During that time, a part-time psychiatrist and two part-time psychiatric nurse practitioners tried to piece together enough hours to meet prisoners' psychiatry needs.

distraction he was allowed, and his intellectual disability had rendered him functionally illiterate. Prisoners with ID also consistently described the solitary confinement units as places where the officers were more hostile than in the other units, and complained about the officers taunting them and calling them names, such as "retards."

PDOC should have better systems in place to assess whether prisoners with ID who are held in solitary confinement for extended periods have limited coping mechanisms that must be addressed to ensure proper mental health care. For instance, PDOC does not screen for ID. Instead, it screens for prisoners with low IQs—a flawed proxy for ID, as it is only one of several factors used in making a diagnosis of ID. Until PDOC fixes this problem, it will have difficulty keeping prisoners with ID out of solitary.

E.    The way in which PDOC uses solitary confinement on prisoners with SMI/ID also violates Title II of the ADA.[15]

PDOC's solitary confinement practices also violate Title II in a variety of ways. *See* 42 U.S.C. § 12132. PDOC unjustifiably denies many of its prisoners with disabilities, including those with SMI and/or ID, the opportunity to participate in and benefit from correctional services and activities, such as classification, security, housing, and mental health services, or unnecessarily provides prisoners with psychiatric and intellectual disabilities unequal, ineffective, and different or separate opportunities to participate in or benefit from PDOC's classification, security, housing, and mental health services. *See* 28 C.F.R. § 35.130(b)(1)(i)-(iv). PDOC unlawfully segregates and warehouses prisoners with SMI and/or ID in isolation units, without either individually assessing each such prisoner concerning the risk the prisoner may actually and objectively pose to others, 28 C.F.R. §§ 35.130(d); 35.139, or otherwise justifying the need for segregation, *id.* §§ 35.130(b)(8), (h). PDOC also fails to reasonably modify policies, practices, and procedures where necessary for PDOC to avoid discrimination on the basis of disability. *Id.* § 35.130(b)(7).

As discussed above, our factual determinations concerning PDOC's misuse of solitary confinement on those with SMI/ID largely mirror the determinations we made in the Cresson investigation. Systemwide, PDOC's practices violate Title II because the prison: (1) unnecessarily segregates and isolates prisoners with disabilities and fails to reasonably modify its policies and practices; (2) fails to either properly assess prisoners on an individual basis to determine whether segregation in an isolation unit is appropriate housing or otherwise justify their segregation; and (3) unnecessarily denies opportunities to participate in and benefit from services, programs, or activities to prisoners with SMI/ID who have to be segregated from general population but should not be isolated in their cells.

---

[15] The Department of Justice is charged with enforcing and implementing Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134. The Department may conduct investigations and compliance reviews of public entities, enter into voluntary compliance agreements, and enforce compliance through litigation. *See* 28 C.F.R. pt. 35, subpt. F.

1. PDOC unnecessarily segregates and isolates prisoners with disabilities and fails to reasonably modify its policies and practices.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II extends to all of the prison's services, programs, and activities, including classification, housing, recreation, and medical and mental health treatment, among others, for which prisoners are otherwise qualified. *See Pa. Dep't of Corr.*, 524 U.S. at 209-10, 213 (finding, without exception, that Title II "unmistakably includes State prisons and prisoners within its coverage" and discussing "recreational activities" and "medical services" as covered under Title II to find a motivational boot camp to be a covered entity).

Both serious mental illness and intellectual disabilities, as defined here, qualify as disabilities under the ADA. 42 U.S.C § 12102 (including "mental" impairments under definition of "disability" where they substantially limit major life activities).

The regulation implementing Title II of the ADA requires public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); 28 C.F.R. § 35.152(b)(2) (requiring that prisoners with disabilities be housed in the most integrated setting appropriate to their needs under the program access obligation); *see also Olmstead v. L.C.*, 527 U.S. 581, 592, 597 (1999) ("Unjustified isolation, we hold, is properly regarded as discrimination on the basis of disability."). The Justice Department explained in the 1991 Preamble to the Title II regulation: "Integration is fundamental to the purposes of the Americans with Disabilities Act. Provision of segregated accommodations and services relegates persons with disabilities to second-class status." 28 C.F.R. pt. 35, App. B. Moreover, a covered entity, such as PDOC, may not provide unequal services to qualified individuals with disabilities, *id.* § 35.130(b)(1)(ii), and may not provide different or separate services to qualified individuals with disabilities unless the different or separate services are necessary to provide benefits that are as effective as those provided to others. *Id.* § 35.130(b)(1)(iv). A covered entity also may not, directly or through contractual or other arrangements, utilize criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability. *Id.* § 35.130(b)(3)(i).

Under the ADA, a prison must "take certain proactive measures to avoid discrimination." *Chisolm*, 275 F.3d at 324-26 (holding that facility may have violated the ADA and discriminated against a deaf prisoner when it gave the prisoner pencil and paper instead of an American Sign Language interpreter, and failed to provide the prisoner a device to allow him to place telephone calls in private). The Title II regulation requires the Prison to reasonably modify its policies, practices, and procedures when necessary, as here, to avoid discrimination against prisoners with serious mental illness and intellectual disabilities. 28 C.F.R. § 35.130(b)(7). Prisoners with disabilities thus cannot be automatically placed in restrictive housing for mere convenience. If prisoners with SMI/ID can be housed in general population by being provided adequate care, the prison may not house such prisoners in segregated housing without showing that it is necessary to make an exception. *See id.* § 35.130(b)(3)(i)-(ii) (prohibiting the prison from utilizing "criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; . . . [or] have the purpose

or effect of defeating or substantially impairing accomplishments of the entity's program with respect to individuals with disabilities").

PDOC unnecessarily segregates and isolates prisoners with disabilities and fails to reasonably modify its policies, practices, and procedures where necessary to avoid discrimination on the basis of disability. We found that PDOC is twice as likely to use solitary on prisoners with SMI and that over 1,000 prisoners identified on PDOC's active mental health roster spent three or more continuous months in solitary from May 2012 to May 2013. What we have learned from our tours of the facilities, our prisoner interviews, and our record reviews is that there is an overreliance at PDOC on isolation of prisoners with SMI (many of whom also have ID), and that PDOC has a practice of routinely warehousing prisoners with SMI/ID in solitary on account of their disabilities.

The practice of segregating prisoners in solitary confinement units where reasonable modifications would permit those with disabilities to remain integrated in the prison's general population conflicts with the mandates of the ADA. PDOC typically fails to identify prisoners who have SMI/ID that makes them susceptible to harm in solitary confinement and therefore fails to consider whether reasonable modifications are needed for such prisoners before deciding to house them in solitary confinement. Even when PDOC has identified that a prisoner's behavior is caused by SMI, it fails to consider reasonable modifications to either avoid confining the prisoner to solitary confinement, or if solitary confinement is necessary, to adjust the conditions of the solitary confinement to avoid harm to the prisoner. As described above, PDOC could enable many more of its prisoners with SMI/ID to remain in general population by increasing coordination and continuity of care, expanding the roles of mental health staff in determining the conditions of confinement, providing more resources to mental health services in general population, and improving its screening mechanisms for identifying prisoners with ID. *See supra* pp. 14-16. Because PDOC fails to do so, prisoners with SMI/ID are unnecessarily and impermissibly segregated and isolated.

PDOC must ensure that qualified prisoners with SMI/ID have as equal an opportunity as other prisoners to participate in and benefit from its housing and classification services, programs, and activities, and the benefits that flow from them, such as out of cell time, interaction with other prisoners, and movement outside of confined environments, consistent with legitimate safety and security concerns.[16]

---

[16] The American Correctional Association Standards similarly provide:

> The institution may be required to take remedial action, when necessary, to afford program beneficiaries and participants with disabilities an opportunity to participate in and enjoy the benefit of services, programs, or activities. Remedial action may include, but is not limited to: . . . making reasonable modifications to policies, practices, or procedures.

ACA, Standards for Adult Correctional Institutions § 4-4429 (4th ed. 2003 and Supp. 2010).

19

2. PDOC fails to properly assess prisoners on an individual basis to determine whether segregation is appropriate housing.

PDOC may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities, including classification, housing, and mental health services. 28 C.F.R. § 35.130(h). But PDOC "must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities." *Id.*; *cf. Defreitas v. Montgomery Cnty. Corr. Facility*, 525 Fed. App'x 170, 179 (3d Cir. 2013) (holding that "courts should ordinarily defer to [a prison's] judgment" so long as the "officials have [not] exaggerated their response to these considerations"). Similarly, PDOC may only impose or apply eligibility criteria that screen out or tend to screen out individuals with disabilities or any class or individuals with disabilities from fully and equally enjoying any service, program, or activity if such criteria are necessary for the provision of the service, program, or activity being offered. 28 C.F.R. § 35.130(b)(8). Based on information available to us during the investigation, PDOC's practices do not qualify under either of these standards.

Finally, Title II does not require a public entity "to permit an individual to participate in or benefit from . . . services, programs, or activities . . . when the individual poses a direct threat to the health and safety of others." 28 C.F.R. § 35.139; *see Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 278-88 (1987) (finding direct threat under Section 504, which was codified at 28 C.F.R. § 35.139 for Title II, requires a showing of a "significant risk" to the health or safety of others that cannot be eliminated or reduced to an acceptable level by the public entity's modification of its policies, practices, or procedures).

PDOC cannot categorically deny qualified prisoners with SMI/ID the opportunity to participate in and benefit from housing, classification, and mental health services. In order to establish direct threat, Title II requires PDOC to make individualized assessments of prisoners with SMI/ID, and their conduct, relying on current medical or best available objective evidence, to assess: (1) the nature, duration, and severity of the risk; (2) the probability that the potential injury will actually occur; and (3) whether reasonable modifications of policies, practices, or procedures will mitigate or eliminate the risk. 56 Fed. Reg. 35,694, 35,701 (July 26, 1991); 75 Fed. Reg. 56,180 (Sept. 15, 2010); *Arline*, 480 U.S. at 287-88. The Department explained in the preamble to the original Title II regulation in 1991 that "[s]ources for medical knowledge include guidance from public health authorities." 56 Fed. Reg. 35,701; *see also Bragdon v. Abbott*, 524 U.S. 624, 650 (1998) (explaining that, while not necessarily conclusive in all circumstances, "the views of public health authorities, such as the U.S. Public Health Service, CDC, and National Institutes of Health, are of special weight and authority").

Applying the *Arline* factors, the individualized assessment should, at minimum, include a determination of whether the individual with a disability continues to pose a risk, whether any risk is eliminated after mental health treatment (e.g., whether the individual was denied medications, which resulted in the threat in the first place), and whether the segregation is medically indicated.[17]

---

[17] *See, e.g.*, Am. Psychiatric Ass'n, *Position Statement on Segregation of Prisoners with Mental Illness* (2012), http://www.psychiatry.org/File%20Library/Learn/Archives/ps2012_PrisonerSegregation.pdf ("Placement of inmates with a serious mental illness in these settings can be contraindicated because of

Fundamentally, the individualized assessment should consider the views of mental health providers as to the prisoners' mental health needs and the appropriateness of the placement. *See* 28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability . . . ."); *cf. Purcell v. Pa. Dep't of Corr.*, No. 50-181J, 2006 WL 891449, at *13 (W.D. Pa. Mar. 31, 2006) (finding that a genuine issue of material fact existed as to whether a "reasonable accommodation" was denied when the DOC refused to circulate a memo to the staff concerning a prisoner's disability (Tourette's Syndrome) that explained that some of his behaviors were related to his condition, not intentional violations of prison rules).

To be sure, a public entity may, however, impose neutral rules or criteria that screen out, or tend to screen out, individuals with disabilities if the criteria are necessary for the safe operation of the program, provided that safety requirements must be based on actual risks and not on speculation, stereotypes, or generalizations about individuals with disabilities.

PDOC has recently begun to include mental health staff members when making individual assessments of prisoners with SMI during disciplinary proceedings. However, the policy requiring participation of mental health staff members in disciplinary proceedings is currently only in draft form, and is not being consistently applied throughout PDOC's facilities. Further, mental health staff members are not involved in a review of prisoners who received disciplinary time *before* these policy changes occurred. These prisoners continue to remain in solitary. Also, at present, mental health staff members are not involved in administrative segregation decisions. For this reason, prisoners with SMI/ID are still being automatically placed in RHUs without an individualized assessment. Finally, PDOC does not and cannot conduct an individualized assessment of prisoners with ID when placing them into isolation, because it does not screen prisoners properly, as described above. *See supra* p.19.

Accordingly, PDOC must continue to modify its policies and practices to ensure it is not unjustifiably and automatically placing prisoners with SMI/ID in segregation. Unfortunately, at present, PDOC often fails to meet the requirements of the ADA. Pursuant to the direct threat defense, each individualized analysis must evaluate whether the prisoner poses a health or safety risk to others, based on objective and medical evidence, including treating mental health professionals, and whether modifications that do not result in automatic segregation will eliminate or reduce the risk to an acceptable level.

3.  PDOC denies participation in and benefit from services, programs, or activities to qualified prisoners with SMI/ID who have to be segregated from general population but should not be isolated in their cells.

PDOC fails to ensure that prisoners placed in segregated housing for legitimate nondiscriminatory reasons can participate in and benefit from prison activities, programs, and services. For those prisoners with SMI/ID who cannot be integrated into the general population, the Facility still has an obligation to provide qualified prisoners with the opportunity to

---

the potential for the psychiatric conditions to clinically deteriorate or not improve. Inmates with a serious mental illness who are a high suicide risk or demonstrating active psychotic symptoms should not be placed in segregation housing as previously defined and instead should be transferred to an acute psychiatric setting for stabilization.").

participate in and benefit from mental health services and activities, and other services, programs, and activities to which prisoners without disabilities have access. *See* 28 C.F.R. § 35.130(b). While we applaud PDOC's efforts to provide prisoners with SMI/ID housed in its new SRTUs with access to equivalent activities, services, and programs, those who remain in the solitary confinement units do not have access to anything remotely equivalent to what is provided to prisoners in the general population. *See supra* pp. 8-11.

## IV. MINIMUM REMEDIAL MEASURES

To remedy PDOC's unconstitutional and unlawful use of solitary confinement on prisoners with SMI/ID, its failure to provide constitutionally adequate mental health care to prisoners, and the violations of Title II and its implementing regulation, the Commonwealth should promptly implement the minimum remedial measures set forth below.

The remedies proposed in this letter are narrowly tailored to remedy the conditions that we found throughout the Pennsylvania prison system and are closely tied to our factual and legal conclusions. These proposals are remedial in nature, and seek to address the policies, practices, training, supervision and accountability systems changes necessary for Pennsylvania to overcome existing deficiencies and to come into compliance with the Constitution and the ADA. We note there may be different remedial approaches that would be adequate to address these types of issues.

### A. Prolonged Isolation

PDOC shall ensure that:

1.  PDOC's policies, practices, and procedures are reasonably modified and maintained so prisoners with SMI/ID are not unnecessarily segregated and/or isolated.

2.  If a prisoner shows credible signs of decompensation in isolation, the prisoner's mental health needs are addressed promptly, and if the prisoner shows credible signs of decompensation and the possibility of removing the prisoner from isolation is considered. Whenever a prisoner manifests signs of decompensating, a mental health professional shall assess the prisoner's credibility.

3.  PDOC properly assesses prisoners with SMI/ID on an individualized basis to determine appropriate housing.

4.  The disciplinary or administrative segregation placement process accounts for the risk of self-harm from placement into isolation. Specifically, PDOC shall ensure that prisoners with SMI/ID can effectively participate in disciplinary proceedings, including the provision of appropriate auxiliary aids and services where necessary for effective communication and reasonable modifications where necessary to ensure a prisoner's meaningful participation in disciplinary proceedings. PDOC shall also develop and implement policies and procedures to assess whether to divert from isolation those prisoners whose SMI/ID contributed to their misconduct.

5.  PDOC reports and reviews data regarding lengths of stay in isolation, particularly with respect to prisoners with SMI/ID, and shall take appropriate corrective action.

6. For inmates with SMI/ID who have to be segregated from general population, that such prisoners have the opportunity to participate in and benefit from services, programs, and activities available to prisoners without disabilities consistent with legitimate safety and security concerns.

B. Suicide Prevention and Protection from Harm

PDOC shall ensure that:

1. Prisoners are protected from suicide, suicide attempts, and self-harm.

2. Placement into the POC is short-term with intensive treatment and that prisoners are not discharged from POC to the RHU or other isolation without accounting for the risk of self-harm from such isolation.

3. All staff members are properly trained regarding appropriate responses to suicide attempts or self-harm, are trained on de-escalation techniques, notify mental health staff when time permits, and do not resort to force prematurely.

4. Staff members are properly trained and supervised regarding rounds in the isolation units; that rounds entail a meaningful observation of each prisoner's condition; and that signs of decompensation, risk of self-harm, or suicidal ideation are immediately addressed.

5. Suicides, suicide attempts, and self-injurious behavior are thoroughly documented and reviewed for implications to both security operations and mental health treatment, especially regarding the impact of isolation, and appropriate corrective action is taken.

6. PDOC shall develop an effective risk management system that adequately screens for suicidal or self-injurious behavior and monitors prisoners at risk for these types of harm.

C. Mental Health Treatment

PDOC shall ensure that:

1. Prisoners with SMI receive adequate mental health treatment and that such treatment is provided in a manner that ensures confidentiality.

2. Prisoners are properly screened and assessed for potential mental illness upon intake into the prison. All reasonable efforts to obtain a prisoner's prior mental health records are taken and that this information, along with all screenings, is incorporated into a prisoner's charts.

3. Prisoners on the mental health caseload receive a timely treatment plan that is periodically reviewed and updated.

4. Prisoners with SMI in segregated placements are offered adequate therapeutic and recreational out-of-cell treatment, consistent with their security levels and treatment needs, which is appropriately documented.

23

5. Prisoners with SMI have adequate access to more intensive mental health care units.

6. There are sufficient mental health staffing levels, taking into consideration the concentration of specialized units and the mental health population at the prison.

7. All staffing components coordinate with each other to ensure that prisoners have access to necessary mental health care and are informed of the practices and procedures on other units.

8. Mental health staff members have sufficient standing at PDOC facilities, especially with regard to housing determinations.

9. Staff members assigned to the specialized units are trained regarding the needs of, and appropriate responses to, the mental health population and prisoners with intellectual disabilities.

10. Documentation of prisoners' mental health contacts and treatment is uniform, comprehensive, organized, and legible.

11. A meaningful quality assurance system for the mental health treatment program is in place and a range of data is collected, aggregated, and reviewed for appropriate corrective action.

D. Use of Force

PDOC shall ensure that:

1. The restraint chair, and other uses of force are not used as punishment or as a substitute for mental health interventions and are instead used only in instances where a prisoner poses a physical threat.

2. Staff members are trained on crisis intervention and de-escalation techniques and that mental health staff members are called in the case of a mental health-related crisis or a planned use of force for a prisoner with mental illness or an intellectual disability.

3. Data is provided and reviewed to assess whether the restraint chair is being overused and as part of an early warning system to identify staff members in need of additional training.

## V. CONCLUSION

Like other state correctional systems, PDOC increasingly has been called upon to take on the task of serving as the state's primary caregiver for those with SMI. Many of these prisoners also have significant intellectual disabilities. However, PDOC's unenviable burden of having to take care of these prisoners cannot excuse its all too routine practice of using a harsh form of solitary confinement to control those with SMI and/or ID instead of providing them with the mental health care treatment they need.

Now is the time to put a stop to these harmful solitary confinement practices and to meaningfully improve the mental health services PDOC provides. We look forward to working

collaboratively with Secretary Wetzel and his staff to address the violations of law we have identified in the context of settlement discussions.

Please note that this findings letter is a public document. It will be posted on the Civil Rights Division's website. The lawyers assigned to this investigation will be contacting PDOC counsel to discuss this matter in further detail. If you have any questions, please feel free to contact Jonathan Smith, the Chief of the Special Litigation Section, at (202) 514-6255, Special Litigation Counsel Avner Shapiro, at (202) 305-1840, or the lead attorney on the matter, Kyle Smiddie, at (202) 305-6581.

Sincerely,

Jocelyn Samuels
Acting Assistant Attorney General
United States Department of Justice
Civil Rights Division

David J. Hickton
United States Attorney
United States Attorney's Office
Western District of Pennsylvania

cc:    John E. Wetzel
       Secretary
       Pennsylvania Department of Corrections

       Nancy Giroux
       Superintendent
       State Correctional Institution at Albion

       David Pitkins
       Acting Superintendent
       State Correctional Institution at Benner Township

25

Joyce Wilkes
Superintendent
State Correctional Institution at Cambridge Springs

Laurel Harry
Superintendent
State Correctional Institution at Camp Hill

John C. Thomas
Superintendent
State Correctional Institution at Chester

Vincent Mooney
Superintendent
State Correctional Institution at Coal Township

Jerome Walsh
Superintendent
State Correctional Institution at Dallas

Brian Coleman
Superintendent
State Correctional Institution at Fayette

Michael Overmyer
Superintendent
State Correctional Institution at Forest

Brenda Tritt
Superintendent
State Correctional Institution at Frackville

Michael Wenerowicz
Superintendent
State Correctional Institution at Graterford

Louis Folino
Superintendent
State Correctional Institution at Greene

Kenneth Cameron
Superintendent
State Correctional Institution at Houtzdale

26

Tabb Bickell
Superintendent
State Correctional Institution at Huntingdon

Trevor Wingard
Superintendent
State Correctional Institution at Laurel Highlands

John Kerestes
Superintendent
State Correctional Institution at Mahanoy

Brian Thompson
Superintendent
State Correctional Institution at Mercer

Robert Smith
Superintendent
State Correctional Institution at Muncy

Eric Bush
Superintendent
State Correctional Institution at Pine Grove

Mark Capozza
Superintendent
State Correctional Institution at Pittsburgh

Kenneth Cameron
Superintendent
Quehanna Boot Camp

Theresa DelBalso
Superintendent
State Correctional Institution at Retreat

Steve Glunt
Superintendent
State Correctional Institution at Rockview

Jon Fisher
Superintendent
State Correctional Institution at Smithfield

27

Gerald Rozum
Superintendent
State Correctional Institution at Somerset

Wayne Gavin
Superintendent
State Correctional Institution at Waymart

Theron Perez
Chief Counsel
Governor's Office of General Counsel

# ATTACHMENT

## "B"



**POLICY STATEMENT**
**Commonwealth of Pennsylvania • Department of Correction**

| Policy Subject: | Policy Number: |
|---|---|
| REASONABLE ACCOMMODATIONS FOR INMATES WITH DISABILITIES | DC-ADM 006 |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| June 28, 1999 | Martin F. Horn | August 16, 1999 |

## I. AUTHORITY

The authority of the Secretary of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901-B of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II. PURPOSE

The purpose of this document is to establish policy and procedure regarding reasonable accommodations for disabled inmates who qualify under the Americans with Disabilities Act (ADA).

## III. APPLICABILITY

This policy is applicable to all Department of Corrections employees, contract staff, and inmates.

## IV. DEFINITIONS

### A. ADA

The Americans with Disabilities Act (ADA) is a comprehensive civil rights law for people with disabilities. The Act prohibits a "public entity" from discriminating against a "qualified individual with a disability" because of that individual's disability.[1]

---

[1] Federal Register, Vol. 56, No. 144, Friday, July 26, 1991 (28 C.F.R. §35.102)

### B. Auxiliary Aids and Services

Refers to qualified interpreters, note takers, transcription services, written materials, telephone handset amplifiers, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDD's), videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments; qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments; acquisition or modification of equipment or devices; and other similar services and actions.[2]

### C. Centralized ADA Coordinator

The Chief Hearing Examiner will serve as the Centralized ADA Coordinator for reviewing ADA grievances pursuant to Department policy DC-ADM 804, "Consolidated Inmate Grievance Review System". At the time of this publication, the Centralized ADA Coordinator is Chief Hearing Examiner Robert S. Bitner. The address for the Centralized ADA Coordinator is Training Academy, 1451 North Market Street, Elizabethtown, PA, 17022-1299. His phone number is (717) 367-9070.

### D. Department

The Pennsylvania Department of Corrections.

### E. Direct Threat

A significant risk of substantial harm to the health or safety of any person with a disability that cannot be eliminated or reduced by reasonable accommodation.

### F. Disability

For purposes of coverage under the Americans with Disabilities Act (ADA) a person with a qualified disability is defined as an individual who:[3]

1. has a physical or mental impairment that **substantially limits one or more** major life activities; or

2. has a record or history of such an impairment; or

3. is perceived or regarded as having such an impairment.

---

2 ADA Title II Action Guide (28 C.F.R. §35.104)
3 ADA Title II Action Guide (28 C.F.R. §35.104)

The following conditions **do not** constitute disabilities: transvestitism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, other sexual disorders, compulsive gambling, kleptomania, pyromania, psychoactive substance abuse disorders resulting from current illegal use of drugs, the current use of illegal drugs, homosexuality or bisexuality.[4]

## G. Essential Job Function

The fundamental job duties of the position the individual with a disability holds or seeks. The term essential function does not include the marginal functions of the position.

## H. Facility ADA Coordinator

The Facility Health Care Administrator will serve as the Facility ADA Coordinator for reviewing ADA claims submitted by inmates.

## I. Major Life Activities

Means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.[5]

## J. Physical or Mental Impairments (which affects a major life activity)

Physical impairments include physiological disorders or conditions, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs (which would include speech organs that are not respiratory such as vocal cords, soft palate, tongue, etc.), respiratory, including speech organs, cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine.[6]

Specific examples of physical impairments include orthopedic, visual, speech, and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, HIV disease (symptomatic or asymptomatic), tuberculosis, drug addiction, and alcoholism.[7]

Mental impairments include mental or psychological disorders, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.[8]

## K. Qualified Individual with a Disability

---

4 ADA Title II Action Guide (28 C.F.R. §35.104)
5 ADA Title II Action Guide (28 C.F.R. §35.104)
6 Department of Justice Code of Federal Regulations reprint (28 C.F.R. §36.104)
7 Department of Justice Code of Federal Regulations reprint (28 C.F.R. §36.104)
8 Department of Justice Code of Federal Regulations reprint (28 C.F.R. §36.104)

An individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.[9]

L.  **Reasonable Accommodation**

A modification or adjustment to a job or work environment that will enable a qualified applicant or employee with a disability to participate in the application process or perform all the essential job functions and which does not create an undue hardship for the employer.

M.  **Undue Hardship**

An action requiring significant difficulty or expense in this implementation of an accommodation under this Act.

## V.  POLICY

It is the policy of the Department of Corrections to establish procedure for an inmate to request an accommodation for a qualified disability under the Americans with Disabilities Act (ADA) that affects a major life activity and to ensure that:

A.  Every inmate, including an inmate with an ADA qualified disability, shall be housed in a manner that provides for his or her safety and security, with security being the overriding concern; and that

B.  Reasonable accommodations are made only if the accommodations pose no direct threat to the individual requesting the accommodation or cause an undue hardship on the Department; and that

C.  Reasonable accommodations will be made to the physical structure of housing used by inmates with ADA qualified disabilities to accommodate for the physical limitations of the disabled inmate and facilitate the inmate's inclusion in facility life;[10] and that

D.  Reasonable accommodations will be made to facility programs and activities to permit participation by ADA qualified inmates with disabilities;[11] and that

E.  No ADA qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of the Department.[12]

---

9 ADA Title II Action Guide (28 C.F.R. §35.104)
10 ACA Standard ACI-3-4137, 1-ABC-2C-08, 3-ACRS-2C-04
11 ACA Standard 1-ABC-3D-04
12 ACA Standard ACI Supplement 1998 3-4265, 3-4380-1, 3-ACRS-3D-03

## VI.  PROCEDURES

### A. Facility Placement

#### 1. Facility Placement[13]

In addition to all other factors considered by the Department in making facility assignments of inmates, consideration may be given to facilities and programming available at various facilities to accommodate an inmate's particular disability(s).[14]

#### 2. Community Corrections Center Placement

In addition to all other factors considered by the Department in making assignment of inmates for Community Corrections Placement, disabled inmates who are accepted for Community Corrections Placement, shall be placed in Community Corrections Centers or contracted facilities that provide accommodations according to the individual needs of the inmate.

#### 3. Transfers

The sending facility is responsible for material submitted requesting the transfer of disabled inmates from one facility to another. Clear indication that the inmate is disabled and the proposed level of accommodation and resulting services needed must be included.[15]

#### 4. Request for Accommodation

a.  An inmate who has a disability that he or she believes is not being reasonably accommodated by the Department shall submit a written request for accommodation on form DC-135A, "Inmate's Request to Staff Member" to the Facility ADA Coordinator or designee.

b.  The DC-135A must include the inmate's specific disability(s) and the specific accommodation or service the inmate seeks.

c.  The Facility ADA Coordinator or designee shall evaluate the request, assess the claim for medical validity, evaluate the inmate's needs (if any), and recommend accommodations that may be necessary.

d.  The Facility ADA Coordinator will submit the recommendations to the Facility Manager and the Regional Deputy Secretary for final determination.  The safety

---

13 ACA Standard ACI 3-4360
14 ACA Standard 3-ACRS-4A-01, 3-ACRS-5A-01
15 ACA Standard ACI 3-4360

and security of the inmate and the security of the facility will always be the overriding concern.

    e.  The Facility Manager will notify the inmate in writing of the final determination within 20 working days of the inmate making the initial request.

    f.  An inmate who has a disability that he or she believes is not being reasonably accommodated by the Department may submit a grievance under Department policy DC-ADM 804, "Consolidated Inmate Grievance Review System". Such grievance must state the inmate's specific disability or disabilities and the specific accommodation or service the inmate seeks. The Centralized ADA Coordinator will conduct final review of all ADA grievances pursuant to DC-ADM 804.

**B. Inmate Work Programs**

    1.  No inmate will be discriminated against from participating in work programs due to a disability. The Department is required to make reasonable accommodations to the known disability of qualified inmate applicants with disabilities. Compensation and job titles will be in accordance with Department policy, 7.9.1, "Inmate Compensation System".[16]

    2.  Accommodations that pose undue hardships for the Department or pose a threat to security need not be provided. Inmates will not be placed in a work program which clearly jeopardizes their safety or security.

## VII. SUSPENSION DURING EMERGENCY

In an emergency or extended disruption of normal facility operation, any provision or section of this policy may be suspended by the Secretary or his/her designee for a specific period of time.

## VIII. RIGHTS UNDER THIS POLICY

This policy does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual. This policy should be interpreted to have sufficient flexibility so as to be consistent with law and to permit the accomplishment of the purpose(s) of the policies of the Department of Corrections.

---

16 ACA Standard 1-ABC-5A-03, ACI 3-4396

## IX.  RELEASE OF INFORMATION AND DISSEMINATION OF POLICY

### A. Release of Information

**1. Policy**

This policy document is public information and may be released to members of tl public, staff, legislative, judicial, law enforcement and correctional agencies and/o inmates upon request.

**2. Procedure Manual (if applicable)**

The procedure manual for this policy is not public information and shall not be released in its entirety or in part, without the prior approval of the Secretary of Corrections or designee. This manual or parts thereof, may be released to any Department of Corrections employee on an as needed basis.

### B. Distribution of Policy

**1. General Distribution**

The Department of Corrections' policy and procedure manuals (when applicable) shall be distributed to the members of the Central Office Executive Staff, all Facility Managers, and Community Corrections Regional Directors on a routine basis. Distribution to other individuals and/or agencies is subject to the approval of the Secretary of Corrections or designee.

**2. Distribution to Staff**

It is the responsibility of those individuals receiving policies and procedures, as indicated in the "General Distribution" section above, to ensure that each employee expected or required to perform the necessary procedures/duties is issued a copy of the policy and procedures.

## X.  SUPERSEDED POLICY AND CROSS-REFERENCE

### A. Superseded Policy

**1. Department Policy**

08.02.18, Americans with Disabilities Act of 1990 , issued June 17, 1996 by Secretary Martin F. Horn

**2. Facility Policy and Procedure**

This document supersedes all facility policy and procedures on this subject.

B. **Cross References**

   1. **Administrative Manuals**

      a. DC-ADM 804, "Consolidated Inmate Grievance Review System"

      b. 07.09.01, "Inmate Compensation System"

   2. **Accreditation Standards**

      a. Administration of Correctional Agencies – 2-CO-4E-01

      b. Adult Correctional Institutions – 3-4343, 3-4344, 3-4345, 3-4346, 3-4356, 3-4360, 3-4265, 3-4380-1, 3-4137, 3-4396, 3-4272, 3-4273, 3-4358

      c. Adult Community Residential Services – 3-ACRS-4E-28, 3-ACRS-2C-09, 3-ACRS-3D-03, 3-ACRS-4A-01, 3-ACRS-5A-01, 3-ACRS-4E-08, 3-ACRS-4E-11, 3-ACRS-2A-01, 3-ACRS-2A-02, 3-ACRS-4E-22

      d. Adult Correctional Boot Camp Programs – 1-ABC-4E-19, 1-ABC-4E-20, 1-ABC-4E-21, 1-ABC-4E-23, 1-ABC-2A-01, 1-ABC-2A-02, 1-ABC-2C-08, 1-ABC-3D-04, 1-ABC-4A-03, 1-ABC-5A-03

      e. Correctional Training Academies – None

# ATTACHMENT "C"

DC-135A

**COMMONWEALTH OF PENNSYLVANIA**

DEPARTMENT OF CORRECTIONS  B-B

**INMATE'S REQUEST TO STAFF MEMBER**

INSTRUCTIONS

*Complete Items Number 1-7. If you follow instructions in preparing
your request, it can be disposed of more promptly and intelligently.*

| 1. TO: (NAME AND TITLE OF OFFICER) ADA Coordinator (Health Care Administrator) | 2. DATE 8/30/99 |
|---|---|

| 3. BY: (INSTITUTIONAL NAME AND NUMBER) DENNIS HUGHES AM535L | 4. COUNSELOR'S NAME WASILEWSKI |
|---|---|

| 5. WORK ASSIGNMENT SCHOOL CLERK | 6. QUARTERS ASSIGNMENT D-B Cell 51 |
|---|---|

7. SUBJECT: STATE COMPLETELY BUT BRIEFLY THE PROBLEM ON WHICH YOU DESIRE ASSISTANCE.   GIVE DETAILS.

*Please See Attached:*

8. DISPOSITION: (DO NOT WRITE IN THIS SPACE)

*Discuss some of these with your
Counselor. You do not meet
medical criteria for the
status you request.*

RECEIVED BY
S.C.I. DALLAS
MEDICAL DEPARTMENT
DATE: 9-1-99

☐ TO DC-14 CAR ONLY                    ☐ TO DC-14 CAR AND DC-15 IRS

| FF MEMBER    CHCA | DATE 9-8-99 |
|---|---|

As per Directive (DC-ADM-006), effective date; 8-16-99, REASONABLE ACCOMMODATIONS for INMATES WITH DISABILITIES.

I am an 100% Disabled Veteran due to a Nervous Disorder and Hypertension. I am totally disabled due to this condition since 1981 when I was also on full Social Security disability.

I arrived at Dallas in February 1982 and spent a month in the hospital waiting for a single cell because I was informed upon inception by the interviewing officer that I COULD NOT be doubled up due to my disability and medical records.

In 1990 I was attacked and savagely beaten when the doors were hit for chow on B block. I didn't know the people or why it happened until later when I was informed by the block CO the parties involved apparently said they did it to take out their frustrations and I was the closest "White Boy".

Not long after that I returned from work to find they had placed another inmate in my cell when other cells were open on the block. I began shaking and hyperventilating and informed the block CO that I needed to be placed in a single cell in the hole because I couldn't double up due to my nervous condition. I wouldn't be able to pursue MAJOR LIFE ACTIVITIES because my nerves had me so ill I couldn't function.

The block CO called control and informed them that he was sending one down for the hole. A few minutes later the area lieutenant came to the block to see what the problem was and could see I was visibly upset. I was shaking, flushed and hyperventilating. He told me "Calm down, we're going to find you a single cell... Relax, you're not going to the hole."
I tried deep deliberate breaths to calm myself but I was so upset that I had the dry-heaves and it took some time for me to regain body control.

I was never in the hole since I'd been here, I held a responsible job, and wasn't a discipline problem and now I might have to go to the hole because I didn't have single cell status which I should have had upon inception. Everyone that came up with me was doubled and the inmate who went in before me asked the CO to be my cell mate and the CO told him that I couldn't be doubled with anyone.

I was informed by the area lieutenant, after he made several phone calls, that there were no single cells available at the time but if I could just spent the night on B block, he'd assured me that I'd be in a single first thing in the morning. I agreed.

It was a horrible night. I couldn't function, couldn't go to the bathroom , couldn't sleep. I spent all night repeating to myself " You'll be alright tomorrow, you'll be alright tomorrow." The next day I was placed in a single cell on D block.

During the next few years I submitted several request slips to the psychiatrist and they kept returning them telling me to state the reason I wanted to see them. When I wrote back and told them they replied, "There are no plans to double you up at this time." This occurred more than once over the years.

A while later I submitted another request and stated I wanted to see them because my nerves were very bad and they finally called me over. They prescribed some medication and agreed I shouldn't be doubled up but never gave me the status. I stayed with the medication for the prescribed time but it didn't help my nerves, but it did make me feel disoriented.

I've taken numerous medications over the years for my condition; including Xanex, Valium, Quaalude, Thorazine, and others, and quit them when I came to Dallas because they wouldn't prescribe Valium, the only medication that seemed to help. So I decided that it was time to get away from the idea of being medicated and stopped taking any and all drugs. When my nerves flare up, as when going through the trauma of losing my single cell, it dramatically affects my MAJOR LIFE ACTIVITIES.

I lose body control, my heart starts beating very rapidly and pronounced and feels like it's going to burst through my chest. I get a tightness in my chest and have difficulty catching my breath. I get uncontrollable muscle spasms and shooting pains, particularly in the left side of my chest.

I have deteriorated discs in my back and neck and the spasms cause severe pain and inflammation that causes a lingering pain that also affects my Major Life Activities.

My 100% Nervous Disorder Disability is a fully documented illness that is difficult for me to deal with on a day to day basis. I try to control it via prayer and meditation relaxing techniques because I don't want to take drugs of any kind except when I can't stand the pain in my neck and back. I have no choice but to seek relief from that pain because at times it becomes too severe to stand.

I don't want to be mentally clouded and dependent on drugs the rest of my life. These drugs adversely affect major body organs such as the liver and kidney if taken over a period of time, and I don't need any more health problems.

I've been in a single cell for 18 years so it certainly is Reasonable Accommodations. This is several times I've had to suffer because of the threat of losing my single cell and I'm getting older and don't know how many more shocks my body can take.

I was informed by the surgeon that if my neck doesn't improve I'd need surgery to repair the damaged discs and I've been putting it off for years and dealing with the pain, at times severe, because I am afraid that if I go to the hospital for the surgery; once again, they'll take my single cell.

I am trying to ward off the inevitable health threat by obtaining single cell status and being able to assure myself that I will not now, or in the future, have to go though the anguish every time a situation arises that could cost me my single cell, through no fault of my own.

I can't double up and I can't stand being in lockup through no fault of my own. The constantly arising situations that could put me in jeopardy are taking a heavy toll on my physical, emotional, and mental health.

I am doing a LIFE sentence and the only peace I have is the safety and solitude of being able to lock up at night in a cell by myself and regroup to face another day.

Therefore I am requesting single cell status ( Z-Code) because I'm 47 years old, have a family history of early heart attacks, and realize that a nervous flare up could lead to one by the way my heart pounds during one.

I'm hoping I won't have to lose my job and everything I've worked for, for 18 years because of something I couldn't control . I've been a school clerk since 1986 and am excused when I get ill because the staff are aware of my condition and I have an excellent work record.

On August 8, 1998, my boss had to call the hospital because I couldn't catch my breath and I immediately went to the hospital and was placed on a breathing tube and after awhile, I was able to breathe on my own.

As per Directive (DC-ADM006), fitting all the applicable criteria, I seek single cell status under the Americans with Disabilities Act (ADA) guaranteeing Reasonable Accommodations for disabled persons including mental and emotional illness under the law.

Thank you for your consideration in this most urgent health matter.


Dennis Hughes AM5356

ATTACHMENT

"D"

AJ

Dennis Hughes AM5356
Drawer K
Dallas, Pa. 18612-0286

September 21,1999

Robert S. Bitner
Chief Hearing Examiner
Training Academy
1451 North Market Street
Elizabethtown, Pa. 17022-1299

Dear Sir;

Enclosed please find a copy of the claim I submitted to the acting ADA Coordinator here at Dallas, Ms. Ginochetti, and her reply.

I have, for several years, discussed this problem with virtually everyone in the institution including my counselor, block officers, the Unit Manager, my supervisors in the Education Department where I work as a school aide, the Psychiatry Department and the Deputy Superintendent.

The people familiar with my situation are sympathetic to my cause because they know me and I have a consistently excellent block and work history.

But the medical and psychiatry departments, who make recommendations, and who are not familiar with my case because they tend to ignore and patronize me, seem to have their own agenda in dealing with problems such as mine. The only option they offer, according to my past experience, is to be put on psycho tropic medication.

My father informed me of your conversation with him and he was quite impressed with your willingness to listen and investigate my claims. It's like a burden being lifted just to have someone who will not just ignore my claims as frivolous without even considering them.

I wasn't sure if I should have sent this in complaint form as stated in Directive (DC-ADM006) but I figured I'd send it in letter form and if a complaint is necessary, please direct me as to how to proceed. I obviously couldn't fit my claims and evidence on a complaint form and I wasn't sure as to how to proceed. ( I wasn't sure of how many copies I'd have to make and if I should send it directly to your office, etc.)

I affirm that all the statements made in my claim are correct and accurate and many of the staff members mentioned are still here and could attest to the facts.

My father also mentioned that you are also a veteran and can empathize with the fact that the federal government does not randomly hand out 100% disabilities; the case must be proven in order to be awarded such a disability benefit, especially for a Nervous Disorder.

(2)

When I was younger, my recourse to adversity was to react with violence because my nerves would force a release of my frustration and inability to cope with life. I haven't been assaultive, either physically or verbally, during my incarceration; and although I'm pleased with this aspect of my demeanor, my introverted style of dealing with the pressures on a daily basis takes quite a toll on my physical and mental well-being. I have no avenue of release due to the lack of physical and mental activity.

I can't exercise to release the pressures because of my back and neck pain, I can't get the problem taken care of because I'm afraid that if I get the surgery required to repair the damage, I'll lose my single-cell if I must be hospitalized for more than a few days. Some of the staff I talked to about this said they'd try to hold my cell but they couldn't guarantee it, and worrying about this would certainly affect my recovery in a negative manner.

My damaged discs have been a reoccurring problem for many years and it's not improving and surgery is the only recourse. I can't stand the pain and lack of activities when I have a flare up because I just lie in my bunk, unable to even move my head without intense pain. I can't continue in this condition and I can't have the problem repaired because of the possibility of losing my single cell while being hospitalized. Facing the possibility of being forced to take a self lock-up, possibly for the rest of my life, because I fear for what might happen if confined in a cell with another person, is my main concern. I don't know what to do.

I'd also lose the job I've held since 1986, and all of this through no fault of my own. If I didn't have to face losing my single cell I would be able to concentrate on having my health problems addressed.

I feel I fit the criteria, being 100% Disabled due to a Nervous Disorder, and I believe it to be a reasonable request, especially since I've been in a single cell for almost 18 years, if I could just get someone in authority to listen.

I was so grateful when I read the directive, and even more so when my father told me he spoke with you, and even he was relieved that someone would take my claims seriously He does worry about me and gets very frustrated that he his unable to help his son and I don't want to be a burden on him because he has health problems of his own.

If I am afforded single-cell status, which I feel I am entitled to under the ADA Act, it'll change my life in enabling me to get the required treatment for my spinal injuries, consequently making me able to participate in activities which help me physically, mentally and emotionally.

(3)

If I need to supply further evidence, or have been unclear, please don't hesitate to contact me directly or through my father and I will immediately comply with your advice.

I was raised not to show outward signs of distress and it took a tragedy and a great deal of soul-searching to realize I had to find another way to recognize, and deal with my imperfections. I believe that just because a person is incarcerated for life, that's no reason not to continue to try to improve himself and maybe help someone else along the way.

Thank you so much for your time and consideration in this matter.

Sincerely,

Dennis J. Hughes

# ATTACHMENT "E"

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
1451 N. MARKET STREET
ELIZABETHTOWN, PA  17022

OFFICE OF THE
CHIEF HEARING EXAMINER

September 22, 1999

Dennis Hughes,  AM-5356
SCI Dallas

Dear Mr. Hughes:

This is in response to your letter of concern regarding your request for single cell status pursuant to DC-ADM 006, Reasonable Accommodations for Inmates with Disabilities.

As you note, I have discussed your claim with your father at some length.  At that time, I also explained to him that should there be any steps you need to take at the institution level, I would advise you.  Having reviewed your letter of September 21, 1999, I need to advise you to utilize the Official Grievance System.   The documentation you forwarded with your letter establishes your attempt to request accommodation in accordance with the procedures outlined under DC-ADM 006.  You now need to follow VI A, 4 f of the policy, which stipulates that an inmate who has a disability that he or she believes is not being reasonably accommodated by the Department, may submit a grievance under DC-ADM 804.

I therefore suggest that you file an official grievance to Mr. Burnett, the Grievance Coordinator at the Dallas institution.   In your grievance, be sure to include your specific disability, your request for single cell status, and your legitimate attempt to resolve this issue informally by written request to the Health Care Administrator, Ms. Ginochetti.  Should your grievance fail to resolve your claim, follow the appeal process outlined under DC-ADM 804 in your Inmate Handbook.

While I will not ensure you resolution to your satisfaction at final review, I can assure you a complete review of your claim, the institution responses, and the issues you raise to final review should you do so.

Sincerely,

Robert S. Bitner
Chief Hearing Examiner

pc:    Superintendent Varner
        Mr. Burnett

ATTACHMENT
"F"

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
2520 LISBURN ROAD, P.O. BOX 598
CAMP HILL, PA 17001-0598

THE SECRETARY'S OFFICE OF
INMATE GRIEVANCES AND APPEALS

December 12, 2006

Dennis Hughes, AM-5356
SCI Dallas

Re:     DC-ADM 804 – Final Review
        Grievance No. 163137

Dear Mr. Hughes:

This is to acknowledge receipt of your appeal to final review of the above numbered grievance.

In accordance with the provisions of DC-ADM 804, effective January 3, 2005, I have reviewed the entire record of this grievance; including your initial grievance, the grievance officer's response, your appeal from initial review and the superintendent's response. I have also carefully reviewed the issues you raise to final review.

Upon completion of this review, it is the decision of this office to uphold the responses provided by staff at the institutional level. Institutional staff has informed you that you do not qualify for a Z-code. However, due to the "A-code" status, you currently are housed in a single cell. For that reason, I consider your grievance resolved. It is being noted that this issue has previously been addressed and denied in grievance numbers 0923 and 84462.

The responses provided at the institutional level are appropriate and in accordance with Department of Corrections' policies and procedures. Accordingly, your appeal to final review must be denied.

Sincerely,

Sharon M. Burks
Chief Grievance Officer

SMB/bw

cc:     Supt. Wynder          Grievance Office
        DC-15                 Central File

# ATTACHMENT

# "G"

## Description of Discrimination

| | |
|---|---|
| 4-17-99 | Wrote Ms. Shinal in the Psychology department about my nerves. (pp. CI) |
| 8-27-99 | Wrote the Psychiatrist about my nerves. (pp.C2) |
| 9-2-99 | Wrote the Psychiatrist again about my nerves. ( pp.C3) |
| 9-8-00 | Re-wrote Psychiatrist trying to impress upon him the seriousness of my disability. (pp.C4) |
| 8-30-99 | Wrote the Health Care Administrator (The ADA Coordinator)requesting Z-code. (Single Cell Status) (pp. B3-B7) |
| 9-21-99 | Wrote the Chief Hearing Examiner Mr. Robert Bitner for advice and assistance. (pp.A1,A3) |
| 9-22-99 | Received his response. (pp.A4) |
| 10-99 | Filed Grievance # DAL-0923-99 as advised. (pp.B1-B2) |
| 10-5-99 | Received response to grievance. (pp.B3) |
| 2-11-02 | Wrote Deputy Stachelek re-requesting Z-code and his response. (pp.E1,E4). (only included cover page because the exhibits are copies of those presented. |
| 5-19-02 | Wrote Mr. Cole ( My Unit Manager) documenting and describing my disability as advised. (pp.F1-F10) |
| 8-22-02 | Re-wrote Deputy Stachelek and his response. (pp.G1-G2) |
| 1-2-04 | Wrote Superintendent Lavan and his response. (pp.H1) (Cover page only) |
| 5-19-04 | Wrote Deputy McGrady requesting Z-code and his response. (pp.1-1) |
| 5-20-04 | Wrote Dr. Kale (Psychiatrist) and his response. (pp.12) Filed Grievance #84462(pp.J1,J2), and it was rejected (pp.J-3), I then re-filed (pp.J4,J5), and the response. (pp. J6) |
| 6-22-04 | Reviewed for Z-code by Mr. Barsh (Unit Manager), Mr. Wiencowski (Psychologist), and Mr. Kaminski(Counselor), and a few days later was told they had "No Problem" with me being granted Z-code. A few weeks later was informed that a vote sheet would not be circulated which is necessary for Z-code, violating Policy 6.5.3, Sec. VI Sub. Sec. B,4. |

(Continued)

| | |
|---|---|
| 4-05 | Single cells were once again being taken from non Z-Coded inmates.4 |
| 4-15-05 | Wrote Ms. Rodgers (My Unit Manager) and her response. (pp.JJ-1) |
| 5-7-05 | Wrote Superintendent Wynder asking to be Z-Coded and explaining my disability. ( No response) |
| 5-8-05 | Called by Ms. Rodgers who said she received a copy of the request I sent to Mr. Wynder, and that I'd be staffed for Z-Code, probably the following day. |
| 5-23-05 | Wrote to Ms. Rodgers after not hearing anything for several. weeks and her response. (pp.JJ-2) |
| 7-05 | Spoke to Deputy Kneiss and he informed me that he voted "No' on my vote sheet for Z-Code. |
| 7-25-05 | Wrote Dr. Kale (Psychiatrist). (No Response) |
| 9-30-05 | Wrote Superintendent Wynder informing him of my intentions to file a complaint. (No Response) (pp.JJ-3) |

# ATTACHMENT

## "H"

# Anzalone Forensic Psychology, LLC

49 South Main Street, Suite 318
Pittston, Pennsylvania 18640
Telephone: (570) 825-5557; Fax: (570) 655-4233
E-mail: wanzalone@drwfanzalone.com

William F. Anzalone, Jr., Psy.D.
Licensed Psychologist-Commonwealth of Pennsylvania

## FORENSIC PSYCHOLOGICAL REPORT

NAME:           Dennis Hughes
ADDRESS:        State Correctional Institute (SCI) Dallas
                1000 Follies Road
                Dallas, PA 18612
SSN:            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
D.O.B.:         7/31/1952
C.A.:           59 years 11 months (at time of evaluation)

## I.    REASON FOR REFERAL:

Mr. Dennis Hughes is a fifty-nine (59) year-old, widowed Caucasian male who was referred for a forensic psychological evaluation by attorney, Robin Gray, to assess if Mr. Hughes' psychological symptoms meet the requirements of Z Code status which would necessitate single cell housing at SCI Dallas.

## II.    Z CODE SINGLE CELL HOUSING PROCEDURAL REQUIREMENTS:

An inmate could be considered for single cell status if he/she meets any of the following criteria: 1. Inmates who are evaluated by psychiatric/psychological staff as emotionally/mentally disturbed and whose behavior makes them inappropriate to be double-celled; 2. Inmates whose prescribed medical treatment indicates a need for a single cell; or 3. Inmates who have a documented history of aggressive behavior towards cell partners.

## III.    NOTIFICATION OF LIMITS OF CONFIDENTIALITY:

At the outset of this the interview, the evaluator informed Mr. Hughes that this examination was an independent psychological evaluation and did not afford the usual degree of confidentiality inherent in other types of psychological examinations. He was informed that the information he provided during the interview would be included in a written report that would be sent to his. attorney, SCI Dallas, opposing counsel and the court. Mr. Hughes understood that the matters

discussed at the time of the evaluation were not confidential. He demonstrated an understanding of his limits of confidentiality and agreed to participate in the interview.

## IV.    PROCEDURE:

Mr. Hughes was seen for a forensic psychological evaluation on July 30, 2012. A standard clinical interview, with mental status exam, was conducted. Standardized psychological tests were administered to assess personality functioning (Personality Assessment Inventory (PAI)), impact from trauma (Trauma Symptom Inventory (TSI)), and the possibility of feigning psychopathology (Miller Forensic Assessment of Symptoms Test (M-FAST)). In addition, the document below was reviewed:

Document Reviewed:

- Department of Veterans Affairs records and Rating Decision dated December 11, 1980;
- Discrimination letter with Description of Discrimination timeline from Mr. Dennis Hughes to the Department of Corrections, SCI Dallas, date unknown;
- Letter to Robert S. Bitner, Chief Hearing Officer, from Mr. Hughes dated September 21, 1999;
- Letter from Robert S. Bitner, Chief Hearing Officer, to Mr. Hughes dated September 22, 1999;
- Commonwealth of Pennsylvania Department of Corrections Official Inmate Grievance submitted by Mr. Hughes dated October 5, 1999;
- Commonwealth of Pennsylvania Department of Corrections Grievance Rejection Form dated May 21, 2004; and
- Commonwealth of Pennsylvania Department of Corrections Inmate Request to Staff Member dated January 1, 2004 and May 19, 2004.

## V.    RELEVANT HISTORY AND BACKGROUND INFORMATION:

Mr. Hughes is a good historian. He is a widowed, fifty-nine (59) year-old Caucasian male. He was tall and of average body-build. He has been incarcerated for pleading guilty to first degree murder of his wife in May, 1980. He was sentenced to life without the possibility of parole and has been incarcerated for the past thirty-two (32) years at SCI Dallas. He was classified at the SCI Graterford and was transferred to SCI Dallas.

Mr. Hughes has a daughter, Angela (age 38), with his widowed wife. He is "semi-estranged" from his daughter. He stated that he last spoke with her several months prior to this evaluation. Mr. Hughes is also estranged from his brother, Robert (age 61). His father, Robert, passed away from a heart attack when he was eighty-three (83) years-old and his mother, Elisie, passed away from cancer when she was fifty-one (51) years-old.

With respect to Mr. Hughes's medical history, he reported that he underwent triple bypass surgery in January, 2009. He reported that he has arthritis, a titanium plate in his neck and he has

## XI.    FINDINGS AND CONCLUSIONS

The following findings and conclusions are this evaluator's professional opinions based on a reasonable degree of psychological certainty:

1.  Mr. Hughes experienced a traumatic life threatening event and he meets diagnostic criteria for Posttraumatic Stress Disorder;

2.  Mr. Hughes experiences symptoms of anxiety and depression and is diagnosed with GAD and Major Depressive Disorder;

3.  His symptoms of PTSD are secondary to being assaulted by other inmates while waiting for a visit in his cell in 1991;

4.  Mr. Hughes is emotionally and mentally ill. His symptoms of PTSD, GAD and depression are grossly exacerbated by the presence of a cellmate. A double cell is inappropriate for Mr. Hughes;

5.  Mr. Hughes reported that he has an infectious skin disease. His prescribed medical treatment indicates a need for a single cell;

6.  Mr. Hughes' abusive and controlling behavior, anger and propensity for violence, which is secondary to his anxiety, are exacerbated by the presence of a cellmate making him inappropriate to be double-celled. He alleged having a history of aggressive behavior towards cell partners;

7.  Psychotherapy is warranted, recommended and necessary;

8.  Mr. Hughes prognosis is viewed to be guarded.

In conclusion, it is my professional opinion that the battery of psychological instruments administered to Mr. Hughes, in conjunction with the totality of the information derived during the course of the forensic evaluation, warrants psychological diagnoses of PTSD, GAD and Major Depressive Disorder. His PAI results indicated that Mr. Hughes has moderate psychiatric and emotional problems at the present time. He reported a moderate amount of depression. He is sad and unhappy, and he has low confidence and poor self-esteem. He has problems with reality testing and social interactions. He is emotionally unstable and has problems getting along with others. It is also possible that he may engage in self-harming behaviors while incarcerated. These personality features are relatively atypical in comparison to inmates.

Mr. Hughes has exacerbated symptoms of anxiety and worry. This amount of anxiety is not typical for inmates. Mr. Hughes endured a traumatic event in his past, when he was assaulted in 1991, and he experiences anxiety symptoms and distress related to this event. The distress is manifested in avoidance behavior, re-experiencing of the event and increased arousal and

## CERTIFICATE OF SERVICE[1]

I, DENNIS HUGHES, THE PLAINTIFF IN THE FOREGOING CAPTIONED MATTER (U.S. APPEALS COURT No. 13-4726), HEREBY CERTIFY THAT I HAVE, ON THE DATE INDICATED BELOW, CAUSED TO BE SERVED A TRUE AND CORRECT COPY OF THE FOREGOING DOCUMENT TITLED APPELLANT'S EXHIBITS IN SUPPORT OF HIS APPEAL BY DEPOSITING THE SAME IN THE PRISON MAILBOX FOR DELIVERY BY U.S. MAIL, FIRST CLASS POSTAGE PREPAID, ADDRESSED AS FOLLOWS TO THE PARTY BELOW:

RAYMOND W. DORIAN, ESQ.
ASSISTANT COUNSEL
GOVERNOR'S OFFICE OF GENERAL COUNSEL
1920 TECHNOLOGY PARKWAY
MECHANICSBURG, PA 17050

DATED: 3/26/14

DENNIS HUGHES
APPELLANT, PRO SE
#AM-5356, SCI-DALLAS
1000 FOLLIES ROAD
DALLAS, PA 18612-0286

---

[1] The C/S provides notice to counsel for the Appellees of what documents Plaintiff has submitted in support of his appeal to the Third Circuit. All exhibits are included herein except Exhibit A which is the DOJ's Report. A copy of this report was sent to Secy. Wetzel, Penna. Dept. of Corrections by the DOJ.